LAMAR v. WRIGHT.

1. A resulting trust may be established by parol testimony, but no resulting trust arises where a person pays for land with his own money.
2. Where a person acquires property for less than its value at a judicial sale, by there declaring that he is purchasing for another, the law will impress upon the property in the hands of the purchaser a constructive trust *ex maleficio* which may be established by parol.
3. But if the land of L. is bid in by W. at an undervalue by reason of representations made by L. at the sale that W. is bidding for L. or his wife, Mrs. L. cannot, on that ground, complain or claim for herself a constructive trust in the property so purchased by W. in his own name.
4. An unwritten agreement between L. and W. that W. should purchase for Mrs. L. her husband's land, about to be sold under a decree of foreclosure, is within the statute of frauds, and therefore cannot be proved by parol.
5. If L., acting for his wife, agreed with W. that W. should bid in a tract of land for Mrs. L., and after W. had taken the bid in his own name, L., by a written paper under seal, stipulated that the purchase money would be produced and paid by a stated time or else all claim to the land would be abandoned, L. was still acting as agent for his wife in this

particular business, and she was therefore bound by his written agreement.

6. Findings of fact by the Circuit Judge, in a chancery case, from written testimony, overruled.

MR. CHIEF JUSTICE SIMPSON, *dissenting.*

Before KERSHAW, J., Richland, May, 1888.

The appeal was from the following decree:

This cause was heard on the testimony taken at a reference before the clerk, on the pleadings and arguments of counsel. The facts of the case are as follows:

On the third day of February, 1887, Robert G. Lamar, the husband of plaintiff, was the owner of a tract of land described in the complaint, which was advertised and about to be sold under a decree of foreclosure of a mortgage thereon, and for the satisfaction of a judgment against him, the terms of the sale being one-third cash and the balance in two equal annual instalments, with interest. The said R. G. Lamar, being insolvent and desiring to secure the land for his wife, the plaintiff, applied to the defendant with a view of obtaining money on a loan on the security of the land, sufficient to pay for the same, and with the assistance of his right of homestead therein, which would attach when the mortgage was satisfied, secure the land to the plaintiff, the said George K. Wright, the defendant, being a broker and dealer in real estate. The said defendant agreed with said R. G. Lamar to buy the said land for the said R. G. Lamar, for the purposes aforesaid, to be repaid out of the separate property of the plaintiff.

On the 5th day of February, 1887. the said land was sold by the master, and, in pursuance of said agreement, was purchased by the defendant at and for the sum of $2,100, though the same was really worth $3,500, or more, and was purchased at an undervalue in consequence of an understanding on the part of some persons attending the sale with the purpose of bidding thereon, that the defendant was bidding for the benefit of the family of the said R. G. Lamar, which understanding was a consequence of the aforesaid agreement and prevented the persons attending to bid as aforesaid from bidding.

After the said sale the defendant required of the said R. G. Lamar the advance of three hundred dollars cash on said sale, saying he could raise no more than $1,800 on the place; which sum the said Lamar could not then pay in cash, but instead thereof, offered the defendant the note of plaintiff at one year with the endorsement of her son-in-law, B. B. McCreery, a merchant of good standing and credit, for the sum of $330, being three hundred dollars and interest, which the defendant refused to receive. The terms of the sale being only one-third cash, and the defendant having proposed to raise $1,800 by a loan on the place, the only cash stipulated to be paid, before the sale, was so much as would be required to pay the master's fees.

On the 4th day of March, 1887, at 10 a. m., the defendant being satisfied that the money he required could not be raised by the said R. G. Lamar, required of the latter to sign a written agreement with the defendant, set out in the answer, reciting the bidding off of the land as aforesaid, and that the same was not yet complied with, whereby the defendant agreed to transfer his bid to the plaintiff if the sum of twenty-one hundred dollars be paid to him in cash, by 3 o'clock that afternoon, and the said R. G. Lamar agreed, if said payment should not be made by 3 o'clock as aforesaid, he would at once surrender possession to the said defendant. The said R. G. Lamar did this without consulting plaintiff, but supposing he could raise the money from the bank with which he had been negotiating for the money to meet the demands of the defendant. Failing in this, he ceased all further negotiations with the defendant on the subject.

On the 17th day of March, 1887, the defendant paid the master in cash the sum of $2,100, the whole amount of the purchase money for the land, and took an absolute title to himself for the said land, and upon his application the said R. G. Lamar delivered to him the possession thereof; sold him the manure on the place and received from the master $55.87, being the surplus remaining in the hands of the master after paying the mortgage debt, judgment, and costs.

On the 8th day of February, 1888, the plaintiff made a legal tender to the defendant of the sum of $2,232, being the amount of the purchase money and interest thereon at the rate of 10 per

cent. per annum, and demanded of him a title to the said land, declaring herself ready to pay to defendant the expenses of titles or any reasonable charges of defendant for his services in purchasing said land, which tender and offer defendant refused. Defendant has continued in possession of the land, enjoying the rents and profits thereof from the time of its surrender to him by the said R. G. Lamar to the present. Immediately after the refusal of the tender aforesaid, this action was commenced to establish a trust in the land in favor of the plaintiff, and to obtain an accounting between plaintiff and defendant, and upon payment by the plaintiff of the money found due to defendant with interest, that defendant be required to convey the land to plaintiff, or that the same be sold and the proceeds applied to the payment to the defendant of the amount so found to be due to him, and the balance, if any, to the plaintiff.

From these facts it follows that the plaintiff is entitled to the relief demanded. These facts were established mostly by parol evidence, and the same was objected to and made the subject of exceptions to its admissibility on the part of defendant as being in contravention of the requirements of the statute of frauds. The admissibility of such evidence is to be determined by the consideration whether or not there be fraud in the conduct of the defendant in obtaining the title. If the evidence is for the purpose of establishing a contract whereby an interest in the land is to be acquired by the plaintiff under the contract, as a contract, it is not admissible; but if to show such conduct on the part of defendant in acquiring the land and securing advantages in the purchase thereof in consequence of the trust and confidence reposed in defendant, on account of the agreement, as amounted to a fraud or breach of trust, the evidence is admissible and the case outside of the statute of frauds.

Here the contract was admitted by the defendant, so far as that the purchase was made for another. He told Col. Lipscomb that he had bought for R. G. Lamar. The testimony shows that Lamar was acting for plaintiff and seeking to secure the land to his wife. The circumstances were sufficient to satisfy the defendant of his purpose in the negotiation as is conclusively established by the recognition of plaintiff as the person to whom he should make

the transfer of his purchase when paid the purchase money, in the written agreement subsequently procured by him. The answer shows that there was some agreement between him and Lamar for the purpose of securing to him the benefit of the sale, and this should open the door to the admission of evidence to show the whole truth in regard thereto, and for whose benefit it was intended.

In consequence of that agreement having been mentioned, an understanding prevailed among the intended bidders at the sale to some extent, that the defendant was bidding for the family, in consequence of which some were induced to refrain from bidding who would otherwise have offered more for the land than it was bought for by defendant. Under such circumstances, the parol evidence will be admitted and the purchaser be charged with a trust upon the land, according to the principles declared in *Kinard* v. *Hiers*, 3 Rich Eq., 423; *Schmidt* v. *Gatewood*, 2 Rich. Eq., 178; *McDonald* v. *May*, 1 Rich. Eq., 95. The contract is supported by the advantage secured to defendant in obtaining the land at much below its value in consequence of the impression among bidders that he was buying for the family, which could only have resulted from some communication of the fact that such an agreement had been made. Had defendant so stated to bidders, the sale would be void for actual fraud. If the information was given by any one else, the sale would have still been fraudulent, if made at an undervalue. The retention of the land under such circumstances would be a fraud upon plaintiff, for whose benefit the purchase was made, as well as upon R. G. Lamar, whose property was sacrificed at the sale.

The case, therefore, does not fall within the statute. The parol evidence is admissible to show the previous agreement as one of the means whereby an unjust and inequitable advantage in the sale was secured to the defendant, and the property will therefore be charged with a trust in favor of the plaintiff.

The subsequent agreement in writing between R. G. Lamar and defendant cannot impair the rights of the plaintiff. She was no party to that instrument, although it shows upon its face that she was the party to whom the benefit of the purchase was to enure. Lamar did not thereby contract that defendant should be

discharged from his liabilities to plaintiff, if the purchase money were not paid at the hour named. He only agreed to surrender his possession. It was but reasonable that the defendant should have possession of the land until plaintiff had paid or provided for the payment of the purchase money according to the terms of the purchase. The surrender of the possession of the land could in no wise affect plaintiff's rights under the circumstances, for they were in no wise dependent upon such possession. It seems to have been resorted to by defendant as a means whereby to get possession of the land, for he was satisfied that Lamar could not raise the money within the few hours to which he was limited. It was under the circumstances an unreasonable abuse of the advantages of his position and the supposed necessities of Lamar to exact such an agreement, but it succeeded. Lamar gave up his possession when afterwards demanded.

By the terms of the original agreement of purchase, no time appears to have been fixed for the payment of the purchase money. It is evident that defendant was to obtain an advance upon the security of the land, of the sum of $1,800, or at least $1,500, on a mortgage of the land, to run for two or three years. The terms of the sale were one-third cash, and the balance on one and two years. Under these circumstances, the land being worth much more than the defendant's bid, it was inequitable in him to demand of plaintiff the payment of the whole purchase money. It was an abuse of his position and a breach of his duty to plaintiff, who was entitled to a reasonable time, with reference to the conditions of the sale, to comply with her contract with defendant. His payment of the entire purchase money in cash could not abridge the time which ought to have been allowed her for the payment of the purchase money. Therefore, when afterwards the tender was made by the plaintiff, with an offer to pay all proper charges and costs, the defendant was equitably bound to accept such tender and offer, and to convey the land to plaintiff. The tender was in proper time, since no sufficient steps had been taken in order to compel a forfeiture by plaintiff, or her rights under the purchase, and they had not, therefore, forfeited at that time.

It is, therefore, ordered, adjudged, and decreed, that it be

referred to the master to take and state the account between the plaintiff and the defendant in respect to the purchase of the said land and the rents and profits thereof, since the defendant came into the possession thereof, in accordance with the foregoing decree. That in said accounting the plaintiff be charged with the amount of the purchase money paid by the defendant for said land with interest thereon, at the rate of 10 per cent. per annum from the day of said sale, the 5th day of February, 1887, to the day of the tender by plaintiff, the 8th day of February, 1888, and with interest on the same sum from that time to the date of the report of said accounting at 7 per cent. per annum. That plaintiff also be charged in said accounting with such reasonable costs and charges as defendant ought to be allowed for his services and trouble in purchasing said land for plaintiff, and the costs and charges for title deeds, &c. That the defendant be charged in said accounting with the value of the rents and profits of the said land while in his possession, and be allowed credit for all reasonable and proper improvements made thereon by him, to the amount that the same has added to the value of the land, which shall be a charge to said plaintiff in said accounting to the extent of said rents and profits, but not beyond them. That a balance be struck between the parties at said accounting and upon the payment by the plaintiff to the defendant of the balance ascertained by said accounting to be due the defendant, within three months after the coming in and confirmation of the report upon said accounting, together with lawful interest thereon to the date of such payment, the defendant do convey to the plaintiff the said land in fee, freed from all encumbrance upon the same arising since his purchase thereof. And in case the plaintiff shall fail to pay the defendant the said sum by the day aforesaid, the master do advertise and sell the said land at public auction on the first convenient sales-day thereafter for cash, and make titles to the purchaser of said land. That from the proceeds of said sale he pay first the costs and expenses of this action and said sale, and next the sum found to be due by plaintiff to defendant on the said accounting, with interest as aforesaid, and the balance of the said proceeds to the plaintiff, if there be any balance remaining. That if the plaintiff pay the defendant the amount found to be due him on the said

accounting on or before the time limited in order to obtain a conveyance of the land to her as aforesaid, the costs of this action be paid by the defendant.

From this decree defendant appealed.

*Mr. R. W. Shand,* for appellant.

*Mr. F. W. McMaster,* contra.

April 19, 1889.   The opinion of the court was delivered by

MR. JUSTICE MCGOWAN.  On sales-day, February 3, 1887, the master of Richland County, John T. Seibels, Esq., under a decree of foreclosure in the case of "Building and Loan Association *v.* R. G. Lamar," sold at public auction a small tract of land near the eastern line of the city of Columbia, containing 80 acres, more or less, as the property of the defendant, Lamar.  The terms of sale were one-third cash and the remainder on one and two years' credit.  George K. Wright was the highest and last bidder at the price of $2,100.  The sale was not complied with and closed up until March 17, 1887 (about six weeks), when Wright paid the whole purchase money in cash and took titles in his own name.  The sale was confirmed and the proceeds were applied as follows, viz.: costs, $189.68; to two mortgages, $1,854.45; and the remainder upon the homestead of R. G. Lamar, which had been previously assigned in money to him, $55.87.  Soon after the master's deed was executed to Wright, R. G. Lamar sold to him the cotton seed and a pile of manure on the place for $40, and with his family left the place.  Wright took possession, made a crop, and did some repairing of buildings and fences, probably to the value of $1,000.

On February 15, 1888, a year after the sale, Mrs. Carrie M. Lamar (wife of R. G. Lamar) caused a tender to be made of the purchase money paid, and commenced this action against the defendant, Wright; alleging substantially that her husband, R. G. Lamar, before the master's sale, made a verbal arrangement with the defendant that he (Wright) would bid in the land for the plaintiff, and secure himself by a first mortgage upon the same;

and that in accordance with said arrangement he did bid for her, thereby having the land knocked off to him at less than its market value; but in violation of said arrangement with her husband, had it set down in his own name, and now fraudulently refuses to make titles to her as he had agreed to do; and praying that a trust should be declared against said Wright in her favor; that an account be taken as to the amount of purchase money paid by him, and that the land should be sold, and all over refunding to the defendant the purchase money, may be paid to the plaintiff as her property, under the arrangement made for her benefit by her husband as aforesaid.

The defendant, Wright, answered in substance, that he is a broker and real estate agent of Columbia; that he never had any communication, written or .verbal, with the plaintiff concerning the land in question; that before the sale, R. G. Lamar, husband of the plaintiff, approached him, and requested defendant to place a mortgage on the land, and he (Wright) answered that he could procure $1,500 on the security of the first mortgage upon the land; that to this R. G. Lamar assented, and agreed to raise all that would be necessary to pay the bid over $1,500; that it was fully understood that the master was to be paid in cash, so that titles would be made to enable Lamar to make the mortgage to secure the $1,500; and that defendant was not to advance a dollar on the purchase; that he (Wright) bid off the property in his own name for $2,100, but with the full intention of transferring the bid to Lamar whenever he paid the money he was to raise; that he certainly said or did nothing to prevent free and full competition in the bidding; that after the sale he had frequent interviews with Lamar, in all of which he (Wright) expressed his willingness to do all that he had promised, and urged Lamar to do what he had promised, and let the matter be closed up, and in order to help Lamar, he discovered that he could procure $1,800 on the security of the land; Lamar did make efforts to raise the additional $300 necessary, tendered him a note for that amount signed by B. B. McCreery, which he (Wright) declined to take, declining then and always to advance any money himself in the business; believes that Lamar then made an effort to raise the whole $2,100 from the Carolina Bank and failed;

the master was pressing to have the bid closed up, and believing that Lamar could not comply with the terms of the arrangement, they went together to the office of Mr. Shand, who prepared and they signed the following written agreement:

"Memorandum of agreement between George K. Wright and Robert G. Lamar, made March 4, 1887, at 10 a. m. *Whereas* George K. Wright bid off at foreclosure sale my tract of land of eighty acres, near eastern line of city of Columbia, on sales day in February last, at twenty-one hundred dollars, but has not yet complied. Now, the said George K. Wright agrees to transfer his said bid to Mrs. Caroline M. Lamar, if the sum of twenty-one hundred dollars be paid to him in cash by three o'clock this afternoon. And the said Robert G. Lamar agrees, if said payment be not paid by 3 o'clock as aforesaid, that he will at once surrender possession to said George K. Wright, and that any holding of said land thereafter by said Robert G. Lamar will be as agent of said George K. Wright. Given under our hands and seals. (Signed) R. G. Lamar, [L.S] George K. Wright, [L.S.] Witnesses: Robt. W. Shand, M. H. Moore."

That this was the first and only written agreement upon the subject matter of this land, and the first time, as far as defendant remembers, that plaintiff's name was mentioned; "that the defendant (as Wright states) still delayed, wishing to give said Lamar, or his wife for him, every opportunity to make this purchase, but finally, on March 17, 1887, defendant was compelled to assume the bid, and he complied by paying the entire amount in cash—all parties agreeing. He complied in his own name, with his own money, for his own benefit, and took deed to himself. Lamar surrendered the possession, sold to defendant a pile of manure thereon and received pay therefor; received from the master a portion of the proceeds of sale, and permitted the report of sales and disbursements to be confirmed without objection. Defendant never heard of any claim after that by R. G. Lamar or the plaintiff to any interest in the land until it was published in the newspapers that defendant had sold the land at a profit, &c., whereupon this action was brought by Mrs. Lamar."

The case was referred to the master, John T. Seibels, Esq., to

take and report the testimony, which was done. Much of the evidence was parol as to the alleged verbal agreement of Wright to bid off the land for Mrs. Lamar, the plaintiff. To this testimony defendant objected that it was not admissible under the statute of frauds; but the master, holding that he had no right to decide the question, took down all of the testimony, subject to objection, to be determined by the court above. It was voluminous, and of course cannot be reproduced here, but it is all printed in the record. It may, however, contribute somewhat to clearness to give a very condensed outline of it. In brief, it appeared that Wright, under some arrangement, expected to place a first mortgage upon the land to secure some advance to be made for a friend, and with a view to such transaction, he was to bid for the property when it was offered for sale, which he did, and it was knocked off to him at $2,100; that the terms of sale were not complied with, but remained unclosed until March 17, 1887, when Wright assumed the bid and complied with the terms of sale, paying his own money and taking titles in his own name. Up to that time, as Wright claimed, the bid was left open to allow R. G. Lamar time to comply with the agreement; but they differed essentially as to what were the terms of the verbal arrangement, Lamar claiming that Wright agreed to bid off the land for Mrs. Lamar and to advance the whole purchase money, and secure himself by a first mortgage on the property; while Wright most positively affirms, both in his answer and in his testimony, that he never agreed to advance a dollar of his own money: but that (being a land agent) he agreed to advance for a customer as much as $1,500 on the land, and that Lamar was to raise the remainder out of his money, homestead, or otherwise; that after the sale Wright enlarged the amount to be procured by him to $1,800; that R. G. Lamar made efforts to raise the $300, and offered a note for the amount, signed by B. B. McCreery, which was declined. Wright informed Lamar that the parties were "cursing him" for not closing the purchase, and Lamar said, "If I cannot arrange the $300 in three or four days' time, I will surrender the place." Finally they went together to the office of Mr. Shand, and the written agreement of March 4, 1887, was exe-

cuted. Soon after R. G. Lamar sold the manure on the place to the defendant and surrendered the possession.

The cause came on to be heard by Judge Kershaw, who held that all the testimony was admissible, and upon his view of it, granted the relief prayed for, saying, among other things, "That the answer shows that there was some agreement between the defendant and Lamar for the purpose of securing to him the benefit of the sale, and this should open the door to the admission of evidence to show the whole truth in regard thereto, and for whose benefit it was intended. In consequence of that agreement having been mentioned, an understanding prevailed among the intended bidders at the sale to some extent, that the defendant was bidding for the family, in consequence of which some were induced to refrain from bidding, who would otherwise have offered more for the land than it was bought for by defendant. Under these circumstances the parol evidence will be admitted, and the purchaser be charged with a trust upon the land, according to the principles declared in *Kinard* v. *Hiers*, 3 Rich. Eq., 423; *Schmidt* v. *Gatewood*, 2 Rich. Eq., 178; and *McDonald* v. *May*, 1 Rich. Eq., 95. * * * This case, therefore, does not fall within the statute. The parol evidence is admissible to show the previous agreement, as one of the means whereby an unjust and inequitable advantage in the sale was secured to defendant, and the property will therefore be charged with a trust in favor of the plaintiff," &c.

From this decree the defendant appeals to this court upon 14 grounds (1 and 2 of which, challenging the correctness of certain findings of fact, are very long, and will be omitted), charging error as follows :

"3. That his honor erred in holding that defendant's purchase was charged with a trust in plaintiff's favor.

"4. That he erred in receiving parol testimony to establish a trust in land under the facts of this case, and in holding that this case was outside the statute of frauds.

"5. That he erred in holding that because defendant admitted an agreement with Mr. Lamar, parol evidence was admissible to prove a different agreement with another person (*Mrs.* Lamar), or that Lamar was acting only as agent for his wife.

"6. Having found that R. G. Lamar was acting for his wife, his honor erred in not finding that such agency continued throughout the negotiations, and in not holding plaintiff to acts done and agreements made by R. G. Lamar with defendant.

"7. That he erred in permitting plaintiff to reap the advantage, if any, derived from statements made at the sale by R. G. Lamar (who, the plaintiff claims, was her agent and through whom she claims), intended by said R. G. Lamar to discourage bidding.

"8. That his honor erred in holding that plaintiff was not bound by the written agreement.

"9. That he erred in construing the written agreement to affect only the possession of the land, .and, in arriving at such conclusion, he has further erred in charging defendant with an agreement, which finds no support whatever in the testimony.

"10. That his honor overlooked the testimony of R. G. Lamar himself, and did the defendant great injustice by the following finding: 'It (the agreement) seems to have been resorted to by defendant as a means whereby to get possession of the land, for he was satisfied that Lamar could not raise the money in the few hours to which he was limited. It was under the circumstances an unreasonable abuse of the advantage of his position and the supposed necessities of Lamar, to exact such an agreement; but it succeeded.'

"11. That his honor does defendant great injustice and disregarded the concurrent testimony of all parties, in holding that 'The terms of the sale were one-third cash and the balance on one and two years. Under the circumstances, the land being worth much more than the defendant's bid, it was inequitable in him to demand of plaintiff the payment of the purchase money. It was an abuse of his position and a breach of his duty, who was entitled to a reasonable time with reference to the conditions of the sale, to comply with her contract with defendant.'

"12. That he erred in holding that the plaintiff had an interest in the land, and in permitting her to redeem it, or on her failure to do so, in directing a sale.

"13. That he erred in failing to decree, upon the sale ordered by him being had, defendant should have judgment against plaintiff for the deficiency, if any," &c.

There is no doubt that Wright has a chain of paper title— legal title. Section 2019 of the General Statutes (statute of frauds) declares "that no action shall be brought upon any contract or sale of lands, or any interest in or concerning them, * * unless the agreement upon which such action shall be brought, or some memorandum or note thereof shall be in writing, signed by the parties to be charged therewith," &c. This action is brought to set up an interest in lands, without any such agreement in writing, and, by the great conflict in the parol testimony, would seem to afford another proof of the wisdom of the law. There are, however, well established exceptions. One is where a party pays the money of another and takes title in his own name. That raises what is called a resulting trust in favor of the party whose money is so used, and the facts may be proved by parol. Wright paid for this land with his own money, and there can be no resulting trust here. *Ex parte Trenholm,* 19 S. C., 126; *Nesbitt* v. *Cavender,* 27 S. C., 1. There is still another exception, when the legal title is acquired under such circumstances as to avoid the sale or to impress upon it a constructive trust *ex maleficio.*

In order, however, to make out such a case, it is necessary to show actual fraud, such as misrepresentions, concealments, &c.; and we may add, where a purchaser at a public sale enables himself to obtain the legal title at less than the value of the property, by declaring, truly or falsely, that he is bidding for others and not for himself, as in the cases of *McDonald* v. *May,* 1 Rich. Eq., 98, and *Kinard* v. *Hiers,* 3 Rich. Eq., 424, cited in the Circuit decree. In such case parol testimony is admissible, for the reason that, in contemplation of law, there has been no legal sale, and there is really no title; the property still remains as if there had been no sale, and the trust is declared is favor of him who was the owner before the fraudulent sale. As Chancellor Johnstone, with his usual clear discrimination, said in *McDonald* v. *May, supra:* "The establishment of an agreement is not the essential feature of the case. Let it be admitted that there never was an agreement of any description between the parties. The bill not only charges that there was an agreement, but that May was enabled to make his purchases by his statements that he was

acting for McDonald. * * * The statute of frauds, it appears to me, has no application here. This branch of the case does not proceed upon the contract—does not look to an execution of the contract, but founds the remedy upon a fraud," &c.

If the action had been brought by R. G. Lamar to set aside the sale for his benefit, parol testimony would have been admissible as to any matter touching the *bona fides* of the sale. As such, however, is not the character of the action, we will not, of course, undertake to decide anything as to the force of the testimony in that aspect. But we think we ought to say that we do not see the evidence justifying the conclusion that the defendant, Wright, obtained title to the land for less than its market value, by representing himself as bidding for Mr. or Mrs. Lamar. We have read the testimony carefully, in order to ascertain whether, at the sale or before it, he declared directly or indirectly that he would bid or was bidding for any other person than himself; and we have failed to find any such proof—Wright denies it positively, and, as it seems to us, he really had no motive to attempt to chill the biddings; for as the arrangement stood at that time, he was not to get the land itself, but simply a mortgage upon it to secure a certain amount to be loaned. He did say after the sale, in general terms, that he had bought for R. G. Lamar, which, however, was not inconsistent with his understanding of the arrangement, which it seems he expected to carry out, and for that purpose kept the bid open for more than a month.

Besides, mere opinions as to the market value of land, are more or less uncertain and apt to be somewhat speculative. From the homestead proceedings and the other evidence on the point, we are inclined to think that the market value of the land at the time of the sale was somewhere about $2,500; for within a year after, when improvements had been placed upon it to the extent of $1,-000, it was bargained at private sale to the trustees of the university for $3,500, and the trade only broken up by notice of this proceeding. If the sale was affected by anything which fell from Mr. Lamar as to the defendant, Wright, bidding for Mrs. Lamar, of course they could not complain of that. *Baggott v. Sawyer*, 25 S. C., 405. It will be observed, however, that the action is not brought by R. G. Lamar to set aside the sale as

fraudulent and void, but by his wife, Mrs. Carrie M. Lamar, as a separate and distinct person, not to set aside the sale, but assuming its validity, to give to her the advantage supposed to arise out of it. If the sale were set aside, it would not enure to her advantage; fraud in the sale is no part of her case. We do not clearly see how the sale can be void for one purpose and good for another. It is elementary that no right can arise out of, or be engrafted upon, that which is void for fraud.

We cannot think there is anything in the allegation that it was a distinct fraud upon the plaintiff to require the cash, when the sale, as to two-thirds, was upon a credit; for a first mortgage could not be given until title was executed, and that could not be expected until the money was paid. All agree that such was the express contract of the parties. But be that as it may, it is quite clear that Mrs. Lamar was a stranger—a new party. Before the sale she had no interest in the land, and cannot now possibly have any, except through the alleged agreement of Wright that he would buy it for her. That agreement was not in writing, within the statute of frauds, and parol evidence to prove it was inadmissible. *Schmidt* v. *Gatewood*, 2 Rich. Eq., 177; *Johnston* v. *LaMotte*, 6 *Id.*, 351; *Harrison* v. *Bailey*, 14 S. C., 334; *Howell* v. *Howell*, Harper Eq., 158; *Burden* v. *Sheridan*, 14 Am. Rep., 505; *Purcell* v. *Miner*, 4 Wall., 517; *Perry on Trusts*, § 134.

The doctrine is so well put in *Schmidt* v. *Gatewood, supra,* that we do not think it can be necessary to do more than state it: "It is alleged that this purchase was made at a sacrifice, under an agreement on the part of the plaintiff that the family should have the benefit of it. The evidence rests in parol. It is argued that the family, trusting to the agreement, permitted the plaintiff to purchase at a sacrifice; that to allow him to retain the property under such circumstances would encourage fraud, and that, upon this distinct ground, independently of the statute of frauds, a trust should be decreed. Undoubtedly there are cases (such as *McDonald* v. *May*, 1 Rich. Eq., 91) where a party, who enables himself to purchase at an under rate by representing that he is buying for another, is liable to have his purchase set aside for fraud. There are cases where competition is fraudulently

reduced or destroyed. In such cases it matters not whether there was an agreement or not. Indeed, in the latter case, where of course the representation is wholly false, that circumstance serves only to enhance the fraud complained of. Such cases as these steer entirely clear of the statute of frauds. The evidence of the purchaser's representations is received, not for the purpose of substantiating the supposed agreement, but for the purpose of showing the means by which he effected his fraudulent design, and when received it is employed not for the purpose of enforcing the contract, but for that of setting it aside. But no such circumstances have been developed in this case. The fraud insisted on consists merely in the non-fulfilment of the alleged agreement, and depends, of course, entirely upon the question whether there was in fact an agreement to be performed, and that preliminary fact the statute will not allow to be established by parol,'' &c. We can add nothing.

But there is another view which, as it seems to us, must lead to the same result. Wright says that he never met the plaintiff, Mrs. Lamar, nor exchanged a word with her during the negotiations about the sale and loan; that Mr. Lamar always spoke in the first person as to what he would or would not do, and he (Wright) thought he was acting for himself—certainly until March 4, 1887, when he desired the name of his wife inserted in the agreement then signed. But Mr. Lamar says that in the negotiations he was always acting for his wife, and we see that she did endeavor to assist him in raising the $300 required to make the purchase money $2,100. Now, taking that view, we think we are bound to consider that he was still acting for her when he signed the agreement that if the money was not paid by a certain hour, he would surrender the possession, and did so. We find it impossible to concur in the construction and effect given to that paper, that it did not bind Mrs. Lamar; that Mr. Lamar only agreed to surrender his possession, as distinct from that of his wife; and that such surrender could in no wise affect plaintiff's rights, for they were in no way dependent upon her possession. We think it is not unusual for the husband (accustomed to out-door business) to act in such matters as the agent of his wife, considered as a separate person. But we cannot doubt that such

agency in a particular business being once established, it should, as in an ordinary case of principal and agent, continue until the particular business is ended or the agency revoked. As it seems to us, the husband acting for his wife, could not as to a particular act disclaim the agency and assume the personal responsibility, and that the said agreement was binding upon the plaintiff. That paper was the first written agreement upon the subject, and unfortunately the parties were not able to comply with it.

The judgment of this court is, that the judgment of the Circuit Court be reversed, and the complaint dismissed.

MR. JUSTICE McIVER concurred.

MR. CHIEF JUSTICE SIMPSON, *dissenting.* The facts of this case, as found by the Circuit Judge, are as follows : the real estate in question was sold at a foreclosure sale as the property of R. G. Lamar, the husband of the plaintiff, Carrie M. Lamar. It was bid in by the defendant, George K. Wright, not for himself, but for the plaintiff under an agreement made some days before the sale with the said R. G. Lamar, as agent of his wife ; the purchase money to be advanced by Wright, who was to secure himself by a mortgage on the premises ; that the property was knocked down to Wright at $2,100, a reduced price on account of the fact that it was understood by some persons at the sale, who would otherwise have made the property bring a larger price, that Wright was buying for Mrs. Lamar ; that after the sale as above, Wright informed Lamar that he could not advance but $1,800 of the purchase money, and that the remainder, $300, would have to be raised by Lamar ; this sum, Lamar, not being able to raise in cash, tendered a note for the $300, with ten per cent. interest added, endorsed by B. B. McCreery ; this was declined by Wright, who then required R. G. Lamar to sign a written agreement with him, "reciting the bidding off of the land, and that the same had not been complied with, whereby the defendant agreed to transfer his bid to the plaintiff if the sum of twenty-one hundred dollars to be paid in cash by 3 o'clock that afternoon, and the said R. G. Lamar agreed if said payment was not made by 3 o'clock as aforesaid, he would at once surrender possession to said defendant ;" this was done without consulting

Mrs. Lamar, the plaintiff; R. G. Lamar failed to raise the $2,-100 by 3 o'clock of the day mentioned, and a few days thereafter the defendant, Wright, paid the whole amount of the purchase money, $2,100, and took absolute titles to himself, and upon application to R. G. Lamar to that end, he received possession of the land, to wit, in March, 1887; in February, 1888, the plaintiff made a tender of $2,232, the purchase money and the interest at the rate of 10 per cent., declaring herself ready to pay to the defendant other expenses of titles, &c., and demanded titles, which being refused, the action below was commenced, &c.

Now, the first question which arises is, are these facts above to be regarded as the facts of the case, to which, and upon which, the law must be applied and the rights of the parties adjudicated? This depends upon the application of the following rule, which has been uniformly acted upon by this court, and which is the rule in all courts where the law is properly administered, to wit, that the findings of fact by a Circuit Judge must be taken and regarded as the facts of the case, unless said findings are either entirely without evidence in their support, or the great weight of the testimony is against them.

Now, applying this rule, what do we find? There can be no dispute as to the finding that the defendant, Wright, did not bid off the land in the first instance for himself. This is testified to by R. G. Lamar, admitted in the answer of the defendant, and fully appears from the fact that Wright did not take titles to himself until some time after the bidding, when several efforts had been exhausted to make arrangements for the titles to be executed to Mrs. Lamar.

Second. There was testimony that Wright was not only not bidding for himself, but that he was bidding for Mrs. Lamar. R. G. Lamar testifies positively that some days before the sale he called upon Wright and asked him if he could not make some arrangement to buy in the place for Mrs. Lamar; that Wright asked what property Mrs. Lamar had, and he stated that she had lands in Kershaw County, from which she could reimburse him, and after several interviews the arrangement stated above was made. True, Wright denies this, and this produces a conflict, but we cannot say that there is no evidence to support these find-

ings, nor that the great weight thereof is against them. There was some testimony also that the land would have brought more than it did, but for the fact that certain parties who had intended to buy, heard in some way that it was to be bid in for Mrs. Lamar. John Crowly said that he was present at the sale, and was there with a view of buying it, and was prepared to give $2.500, but hearing that it was to be bought for Mrs. Lamar, did not make a bid. See also testimony of Mr. Lorick to the same effect. There is certainly testimony also to the facts that after the sale, Wright declined to carry out the understanding as first agreed upon, and suggested one or two others, as found by the Circuit Judge, more and more stringent, none of which Lamar could comply with. And finally that he paid up the whole purchase money and had the titles executed to himself and took possession.

It is said, however, that all of this testimony was verbal, and therefore incompetent in this case, it being a case where an interest in land is attempted to be set up upon contract, which, it is contended, should have been in writing under the statute of frauds, and could only be proved by the writing. It is true that the statute of frauds requires all contracts for the sale of land, or of any interest therein, to be in writing or else they are void; and in a contest turning upon a contract for the sale of land, or of any interest therein, the writing must be produced, verbal testimony being utterly incompetent. But does this contest between the plaintiff, Mrs. Lamar, and the defendant, Wright, depend upon, or involve in the least, a contract for the sale of land, or of any interest therein, by Wright to Mrs. Lamar? We do not think so. According to the facts found by the Circuit Judge, Wright was not to become a purchaser for himself, nor even a purchaser at all. He was to bid at the sale, it is true; not for himself, however, but for Mrs. Lamar. It does not seem that it was ever intended that titles were to be executed to him, but they were to be executed to Mrs. Lamar, who was to make payment of the purchase money out of funds to be advanced by Wright, which she was to secure to him by a mortgage of the premises—which could only be done by her getting the titles. Wright said to

Lamar in the first interview, that he thought the arrangement could be made by putting a mortgage on the place.

So that the action below did not involve the enforcement of a contract for the sale of land or of any interest therein, and therefore it steers clear of the statute of frauds. Instead of being an action to enforce a contract for the sale of land, it was an action by a principal against an agent, where the agent has taken titles to himself, in a purchase where he obtained an advantage by the fact that he was understood to be buying for his principal. Such being the character of this case, it differs from those cases relied upon by the respondent where the facts brought them under the statute of frauds, and excluded verbal testimony to enforce the agreement of sale, though the testimony under certain circumstances, even in such cases, might be allowed to set aside the sale as fraudulent.

Under the facts as found by the Circuit Judge, I think he was right in charging Wright with a trust, according to the principles declared in the cases cited, to wit: *Kinard* v. *Hiers*, 3 Rich. Eq., 423, and *McDonald* v. *May*, 1 Rich. Eq., 95. I cannot concur in the idea that the written agreement entered into by Wright and R. G. Lamar, by which Lamar agreed to give up the premises unless he raised the entire purchase money, $2,100, by 3 o'clock, was binding upon the plaintiff. R. G. Lamar testifies that this paper was executed without the knowledge of Mrs. Lamar, and it does not seem to me that it was within the scope of his original agency, which was to get Wright to bid in the land for her. More than this, it was a very stringent agreement and made under circumstances of pressure, which does not appeal to the court for support.

I think the judgment below should be affirmed. And therefore I am unable to concur in the opinion of the majority.

                                        Judgment reversed.