16872

GARDNER v. NASH
(82 S. E. (2d) 123)

304

Messrs. *E. C. Dennis, Jr.,* of Darlington, and *Robinson, Robinson & Dreher,* of Columbia, *for Appellant,*

*Messrs. Tison & Tison,* of Hartsville, *for Respondent,*

May 19, 1954.

OXNER, Justice.

This action was brought to set aside a sale made by the Master of Darlington County under a decree foreclosing a mortgage given by Etson R. Gardner to the Bank of Hartsville, and to require the purchaser, K. C. Nash, to reconvey the property to Gardner upon the ground that by Nash's fraudulent conduct, the bidding was chilled and the property purchased by him at far less than its real value. Joined as defendants with Nash were Edwin P. Guy and James E. Powe to whom two mortgages were given by Nash after he obtained deed from the Master, but the assignee of these mortgages disclaims any lien upon or interest in the property. Guy and Powe, therefore, are not concerned with any of the issues involved on this appeal and the action may be regarded as one by Etson R. Gardner against K. C. Nash. Upon issues being joined, the cause was referred to the Master for Darlington County for the sole purpose of taking the testimony. The case was thereafter heard by the resident Judge of the Fourth Circuit who granted the relief sought in the complaint and, further, awarded judgment in favor of Gardner for $499.66, representing the fair rental value of that part of the property occupied by Nash, less the amount paid by him for the land, with interest.

On this appeal, the first question raised is that the testimony does not sustain Gardner's claim that Nash acquired the property by fraud. It is said that Nash was the highest bidder at a fairly conducted judicial sale.

Gardner acquired under the will of his father approximately 160 acres of land in Darlington County from which at various times he sold several parcels, leaving approximately 137 acres, about half of which was cleared. He lived in a rented house near this property and for a number of years farmed about 13 acres of the 137 acre tract, and rented the remainder for $300.00 a year. The Bank of Hartsville held a mortgage on this tract of land executed by Gardner which, with other indebtedness to the bank, amounted to approximately $1,100.00. This mortgage was foreclosed and the property advertised for sale on salesday in July, 1947.

The testimony offered by Gardner to sustain the claim of fraud was substantially as follows: Several weeks before the sale, Nash went to see Gardner, whom he had known for a number of years, and inquired what he was going to do about the property. Gardner replied that he intended to let it go to the highest bidder and with his equity in the proceeds of sale buy a small place elsewhere so that he would be free of debt. Nash argued that this would be a mistake and that Gardner would always regret losing his home place. He offered to bid in the property for Gardner and advance the purchase price. Gardner was not favorably inclined to this suggestion. They met several times later and discussed the matter without any definite agreement. Finally, they met at the court house just prior to the sale and after some discussion, reached an agreement whereby Nash would bid in the property for and take title in the name of Gardner, and advance the purchase price. Gardner was to continue farming the land which he had been cultivating. Nash was to rent the remainder for $300.00 a year, the amount Gardner previously received, which would be annually applied on the purchase price until Nash was fully reimbursed, with the option on the part of Gardner to terminate this arrange-

ment at any time after one year by paying the balance of the purchase price. After this agreement was made, Gardner in the presence of Nash, stated to several who contemplated bidding that they could do so or not as they wished, but that Nash was going to bid the property in for him. Those two remained together during the sale and it was generally understood by those present that Nash was bidding for the benefit of Gardner. The first bid was by the attorney for the Bank of Hartsville. The next was by a party who had purchased a small parcel from Gardner but failed to have his deed recorded prior to the mortgage. He was seeking to protect his interest. After one further bid, the property was knocked down to Nash for $1,100.00. Although several were willing to buy the property at a far greater price, they abstained from bidding because they did not care to run the price up on Gardner. One of these prospective purchasers intended to bid $3,500.00 and had with him his father-in-law's check for that amount. Another stated that he intended to bid $4,000.00.

There was abundant testimony showing that at the time of the sale the property was worth, exclusive of the timber, $5,000.00 or more. There was a tobacco allotment on the place of five or six acres which was very valuable. About three-fourths of the timber had been previously conveyed by Gardner to Nash, but the foreclosure sale, according to the finding of the Circuit Judge to which there is no exception, included this timber because the bank's mortgage was recorded prior to the timber deed.

Nash's version of the transaction is entirely different. He says that he bid in the property subject to an understanding that Gardner could take over his bid at any time before he was required to comply. He testified that after he had been notified by the attorney for the bank that compliance must be had by a specified date or the property would be resold, he went to see Gardner who stated he was not interested in buying. Nash says that he then proceeded to borrow the purchase price and comply with the terms of

sale, taking deed in his own name free of any obligation to Gardner.

The deed of the Master to Nash was executed on August 11, 1947, although Gardner testified that it was not until some time in 1952 that he learned that Nash had taken title in his own name.

There is abundant evidence to the effect that in 1948 and on several occasions in subsequent years, Gardner with money which he had arranged to borrow from his sister endeavored to close the transaction by the payment of the purchase price, but each time Nash asked that settlement be deferred until certain other affairs of his were straightened out.

In the fall of 1947, Gardner gathered his crops as usual and collected his rent. It is admitted that he has since continued in possession of that part of the land which had been previously cultivated by him but there is a sharp dispute as to the character of this possession after 1947. Gardner testified that in 1948 and 1949, Nash financed his farming operations under an arrangement whereby the proceeds from the tobacco would be equally divided but that Nash had nothing to do with the grain planted. Nash claims that during these years, the land occupied by Gardner was sharecropped and each fall a division of all crops was made on the customary basis, and that in 1950 and '51, he rented this portion to Gardner for a cash rental. Gardner denied ever renting any of the property from Nash.

The Circuit Judge concluded that the clear preponderance of the testimony sustained the claim of fraud. He found that the fair value of this property at the time of the sale was "at least four to five thousand dollars, irrespective of the value of the timber," and that as a result of Nash's fraudulent conduct in chilling the bidding, the property brought less than one-third of its value. These factual conclusions are vigorously challenged by counsel for appellant who state in their brief that the decree of the Court below "is based upon a complete acceptance of the respondent's testi-

mony and a rejection of the appellant's." This is largely true, but the Circuit Judge, who resides in Darlington County and doubtless knew the parties or some of their witnesses, was at liberty to accept respondent's testimony which was corroborated in many particulars by disinterested witnesses, and reject the practically uncorroborated testimony of appellant who, at the time of the trial, had been convicted in the Federal Court of receiving stolen automobiles and was then on probation. After carefully considering the entire testimony in the case, we do not feel warranted in disturbing the facts found by the Circuit Judge.

In the able brief of appellant, our attention is called to certain inconsistencies in respondent's testimony and also several facts which, it is claimed, make unreasonable the contention of respondent. Without undertaking to detail these facts and circumstances, it is sufficient to say that there would be more force in this argument if respondent were a man of business experience but the testimony is that he is lacking in such experience, has only a third grade education and is hardly able to read or write.

The overwhelming weight of the evidence is to the effect that the bidding at this judicial sale was chilled because of a general understanding that Nash was buying for the benefit of Gardner, and as a result the property brought far less than its real value. While it is true that there is no evidence that Nash stated at the sale that he was bidding for Gardner, yet Gardner did so state to the prospective bidders in the presence of Nash, who remained silent. The effect on the sale was the same as if the statement had been made by Nash. His silence was tantamount to assent. Failure to speak when fair dealing requires one to do so may amount to a suppression of a fact which should have been disclosed, and constitute a fraud.

The second and final question is whether this action is barred by the Statute of Frauds. The governing principles are well stated in *Kinard v. Hiers,* 3 Rich. Eq. 423, as follows:

"In the construction of the statute of frauds, Courts of Equity have adopted, as a general principle, that, as the statute is designed as a protection against fraud, it shall not be set up as a protection or support of fraud. 1 Story Eq., Section 330. These Courts will not execute, specifically, contracts concerning lands ·which are not manifested in writing as required by the statute; but they will cancel conveyances obtained by fraudulent misrepresentations in parol, or impose upon the legal owners the character of trustees. The doctrine on this topic is expressed with force and discrimination in *McDonald v. May*[*'s Exr's*] (1 Rich. Eq. [91], 95). In the circuit decree of the Chancellor in that case, it is said: 'The statute of frauds, it appears to me, has no application here. This branch of the case does not proceed upon the contract,—does not look to an execution of the contract,—but founds the remedy upon a fraud, by the practice of which the purchaser obtained possession of the plaintiff's property. Can it admit of a doubt that, if a bidder at sheriff's sale, either of real or personal property, represents that he has contracted to purchase in the property for the debtor's benefit, when, in fact, there never was such a contract, and in consequence becomes the purchaser, he shall not be allowed to retain the advantage he has thus unjustly obtained? It seems to follow that all the purchases by the purchaser here, must be deemed liable to a trust in his hands. For although it appears that no proof can be made that his representations drove off any particular competitor, and it is proved that the majority persisted in bidding, and made the property bring a pretty full price, proof of actual injury is not necessary when actual fraud is established.' The Court of Appeals, in the same case, say: 'We are satisfied with the view taken by the Chancellor, that, if purchases be made by one representing himself to be acting under an agreement with a debtor, and for his benefit, when, in fact, there was no agreement, the advantages thus obtained should be taken away from him on the grounds of fraud.' Again, in *Schmidt v. Gatewood* (2 Rich. Eq. 162), the doctrine is reiterated, with the additional re-

mark, that. where competition is fraudulently destroyed or reduced, it matters not whether, in fact, there was an agreement or not for the benefit of the debtor."

If there had been no fraud in the sale and we were merely called upon to enforce an oral agreement on the part of appellant to buy the property and later, upon being reimbursed, to reconvey same to respondent, such an action would be barred by the statute. The imputation of fraud would then have no other basis than the mere refusal to perform or the repudiation of the contract, and the statute of frauds would not allow the preliminary fact that there was such a contract to be established by parol. But relief here does not require enforcement of the alleged contract by appellant. "It is neither whether such an agreement was made nor whether it should be executed. It relates simply to the means by which he acquired the title he holds. The inquiry is, were those means fair or unfair, which is neither more nor less than an inquiry whether he has a good title. Did he acquire his title by fraud? If he did, it is as liable to be set aside, as it would be in a case where no agreement had ever been mentioned or thought of." *Johnston v. La Motte,* 6 Rich. Eq. 347. Under these circumstances, a trust *ex maleficio* or a constructive trust arises in favor of the person whose property was thus acquired. *Lamar v. Wright,* 31 S. C. 60, 9 S. E. 736.

In addition to the foregoing authorities, the following decisions fully sustain the conclusion of the Circuit Judge that under the facts found by him, this action is not barred by the statute: *McDonald v. May's Ex'rs,* 1 Rich. Eq. 91; *Denton v. McKenzie,* 1 Desaus. 289; *Keith v. Purvis,* 4 Desaus. 114; *Cox v. Cox,* 5 Rich. Eq. 365; *Jarrot v. Kuker,* 78 S. C. 510, 59 S. E. 533. The subject under discussion is annotated at length in 42 A. L. R. at page 10, and 135 A. L. R. at page 232.

Appellant seeks to distinguish the foregoing cases by asserting that the instant action is based upon his refusal to convey the property in accordance with

the alleged agreement and is not founded upon alleged fraud in chilling the bidding. But fraud in the sale is specifically alleged in the complaint and in the prayer the Court is asked to set aside the deed to appellant. It is true that there is also included in the demand for judgment that respondent be given possession and that appellant be required to convey the property to him but as pointed out in *Fairey v. Kennedy,* 68 S. C. 250, 47 S. E. 138, 140, where a similar question was raised, "the demand is not a part of the cause of action, and is not controlling." The Court there quoted with approval the following from *Sheppard v. Green,* 48 S. C. 165, 26 S. E. 224: " 'It is well settled that the plaintiffs may obtain any relief appropriate to the case made by the pleadings and evidence, without regard to the form of the prayer for relief.' "

It has been suggested that whether so denominated or not, the practical result of sustaining the circuit decree is the same as if the Court had undertaken to specifically enforce an agreement on the part of appellant to buy the property and reconvey same to respondent. In answer to such a contention, the Court in *Ryan x. Dox,* 34 N. Y. 307, 90 Am. Dec. 696, said: "Where one of the parties to a contract void by the statute of frauds avails himself of its invalidity, but unconscientiously appropriates what he has acquired under it, equity will compel restitution; and it constitutes no objection to the claim that the opposite party may happen to secure the same practical benefit through the process of restitution which would have resulted from the observance of the void agreement."

All exceptions are overruled and the decree of the Circuit Court is affirmed.

STUKES, TAYLOR and LEGGE, JJ., and BRUCE LITTLEJOHN, A. A. J., concur.