## 12455

### SCOTT v. NEWELL *ET AL.*

(144 S. E., 82)

1. APPEAL AND ERROR—DECREE OVERRULING OR CONFIRMING MASTER'S CONCLUSIONS OF FACT IN LAW CASE IS AS BINDING ON SUPREME COURT AS JURY'S VERDICT.—A decree overruling or confirming a Master's conclusions of fact in a law case is as binding on the Supreme Court as verdict of jury.

2. APPEAL AND ERROR—CONCURRENT FINDINGS OF REFEREE AND TRIAL JUDGE IN CHANCERY CASE REVIEWABLE BY SUPREME COURT IF AGAINST CLEAR PREPONDERANCE OF TESTIMONY.—In chancery case, if concurrent findings of Referee and trial Judge are against clear preponderance of testimony Supreme Court has power to review findings.

3. PRINCIPAL AND AGENT—AGENCY INVOLVES QUESTION OF FACT.— Agency involves a question of fact.

4. PRINCIPAL AND AGENT—FINDING THAT DEFENDANT BID IN PROPERTY AT FORECLOSURE SALE AS PLAINTIFF'S AGENT HELD AGAINST CLEAR PREPONDERANCE OF EVIDENCE.—In suit to set aside deed to property purchased at mortgage foreclosure sale and to have deed made to plaintiff, finding that defendant bid in land as agent for plaintiff *held* against clear preponderance of evidence.

5. MORTGAGES—EVIDENCE HELD INSUFFICIENT TO SHOW FRAUD ON PART OF DEFENDANTS IN BIDDING IN LAND AT MORTGAGE FORECLOSURE SALE AND TAKING DEED THERETO.—In suit to set aside deed to property purchased at mortgage foreclosure sale and to set aside confirmation of sale and to have deed made to plaintiff, on ground that one of defendants fraudulently misled plaintiff into believing that such defendant represented plaintiff as agent in bidding in land and transferred bid to other defendants to whom deed was executed, evidence *held* insufficient to show fraud on part of defendants.

6. MORTGAGES RELATION OF VENDOR AND VENDEE HELD NOT TO PRECLUDE VENDEE FROM BIDING AT MORTGAGE FORECLOSURE SALE.—That plaintiff was vendor and defendant vendee did not preclude defendant from bidding at mortgage foreclosure sale of property where plaintiff was party to such foreclosure proceeding and under the decree of foreclosure any person had a right to bid at sale, since as sale extinguished all right and title that plaintiff as vendor had in land defendant as vendee had right to purchase for his own protection.

7. JUDGMENT—JUDGMENT MAY BE ATTACKED COLLATERALLY, DIRECTLY, OR BY ACTION ON EQUITY SIDE OF COURT.—There are three ways

of attacking a judgment—collaterally, directly, or by an action on the equity side of the Court.

8. JUDGMENT—JUDGMENT MAY BE COLLATERALLY ATTACKED ONLY WHEN DEFECTS AND INFIRMITIES ARE APPARENT BY INSPECTION.—A judgment may be attacked collaterally only when its defects and infirmities are apparent by inspection of it.

9. JUDGMENT—JUDGMENT IS DIRECTLY ATTACKED BY MOTION ON NOTICE IN SAME CASE WITH SAME PARTIES.—A direct attack on a judgment is made by a motion on notice in the same case with the same parties.

10. MORTGAGES—SUIT TO SET ASIDE DEED AND ORDER CONFIRMING MORTGAGE FORECLOSURE SALE, AND TO HAVE DEED MADE TO PLAINTIFF, HELD PROPER FORM OF PROCEEDING UNDER ALLEGATION THAT PROPERTY WAS FRAUDULENTLY BID IN BY DEFENDANT AS PLAINTIFF'S AGENT AND DEED ISSUED TO ANOTHER (ACTS 1923, p. 126).—Where plaintiff alleged that one of defendants fraudulently misled plaintiff into believing that such defendant was representing plaintiff as agent in bidding in property at mortgage foreclosure sale, but trasferred such bids to the other defendants, to whom deed was issued, *held* that suit to set aside such deed and to set aside the order confirming the sale and confirmation provided by Acts 1923, p. 126, and to have deed made to plaintiff, was the correct form of proceeding.

11. EQUITY—HE THAT SEEKS EQUITY MUST DO EQUITY.—He that seeks equity must do equity.

12. FRAUD—ONE MUST EXERCISE REASONABLE PRUDENCE FOR HIS OWN PROTECTION, NOTWITHSTANDING WRONG COMMITTED UPON HIM BY ANOTHER.—Every person, notwithstanding a wrong committed upon him by some other person must exercise reasonable prudence and diligence in the premises for his own protection.

13. MORTGAGES—PLAINTIFF'S LOSS OF BIDS AT MORTGAGE FORECLOSURE SALE HELD RESULT OF HIS OWN NEGLECT AND FAILURE TO COMPLY WITH TERMS OF SALE BARRING RECOVERY FROM DEFENDANT WHO BID AT SALE AND TO WHOM BID WAS TRANSFERRED.—Where plaintiff alleging that one of defendants fraudulently misled plaintiff into believing that such defendant was bidding in property at mortgage foreclosure sale as agent for plaintiff and transferred bids to other defendants to whom deed was executed, had ample opportunity to comply with terms of sale and acquire bids according to agreement with defendant, but neglected to do so, though he had notice until after land had been advertised for sale and bids transferred, *held* that plaintiff's· failure to comply with terms of sale was proximate cause of his loss of such bids and he cannot recover of defendants therefor.

Before Wilson, J., Williamsburg, October, 1926.    Reversed.

Action by Kemper Scott against J. P. Newell and others. Decree for plaintiff, and defendants appeal.

*Mr. J. D. O'Bryan,* for appellants, cites: *Concurrent findings of fact by Master and Circuit Judge where contrary to or not supported by evidence will be reviewed:* 133 S. C., 395; 122 S. C., 461; 96 S. C., 389. *Time essence of contract:* 106 S. C., 455. *Rule prohibiting those standing in fiduciary relation from purchasing at a judicial sale not applicable here:* 16 R. C. L., 667; 19 R. C. L., 442; 110 S. C., 465; 31 S. C., 183. *"Constructive fraud":* 12 R. C. L., 234; 3 Brev., 31. *If deed set aside, appellants are entitled to a refund of money so paid, or credit for that amount:* 81 S. C., 380. *May not recover on grounds not alleged in complaint where complaint was not amended:* Sec. 436 Code Proc.; 58 S. C., 468; 21 S. C., 221; Id., 226; 23 Cyc., 816; Id., 820; 38 Cyc., 1970; 16 Cyc., 403; Id., 404; 119 S. C., 314. *May not attack official deed in a collateral proceeding after sale has been confirmed:* 83 S. C., 165; 56 S. C., 7; 24 S. C., 404; 117 S. C., 175; 83 S. C., 165; 45 S. C., 597; 112 S. C., 205.

*Mr. Norval N. Newell,* also for appellants, cites: *Case should be reviewed:* 89 S. C., 352. *Distinction between a sale ex parte and sale by order of the Court after adjudication:* 110 S. C., 465. *When the facts show that plaintiffs should not recover, it is the duty of the Court to make such order of its own motion, even in a default case:* 89 S. C., 483.

*Mr. James W. Johnson,* for respondent, cites: *Concurrent findings of Referee and Circuit Judge not disturbed unless shown to be contrary to preponderance of evidence, or controlled or influenced by error of law:* 133 S. C., 395; 100 S. C., 157; 131 S. C., 101; 139 S. C., 95; 134 S. C., 54. *Reasonable time allowed to comply with bid:* 113

S. C., 78; 97 S. C., 242; 87 S. C., 350; 13 S. C., 203. *Pleadings construed liberally:* Sec. 420, Code Proc. *Question of collateral attack on official deed not raised below and cannot be considered here:* 140 S. C., 1; 139 S. C., 545; 138 S. C., 113.

May 31, 1928.

The opinion of the Court was delivered by MR. ACTING ASSOCIATE JUSTICE J. WM. THURMOND.

This action was instituted October 16, 1924, by Kemper Scott, against J. P., N. N., H. F., A. B., & J. L. Newell, by the service of summons and complaint, and affects the title to thirty acres of land in Williamsburg County.

October 31, 1921, E. A. Simmons executed a mortgage to the Federal Land Bank of Columbia, on two tracts of land in Williamsburg County, one tract containing 39½ acres, and the other containing 30 acres; subsequently, November 12, 1921, E. A. Simmons and D. H. Oliver executed and delivered to Kemper Scott four certain promissory notes, each in the sum of $1,280, aggregating $5,120, and as security therefor executed a mortgage on the 30-acre tract aforesaid; thereafter Kemper Scott transferred said notes and mortgage to Marion National Bank, which in April, 1923, foreclosed the mortgage; at the foreclosure sale Kemper Scott purchased the land and received a fee simple deed from the Clerk of Court thereto, May 21, 1923; this deed was duly recorded in the office of the Clerk of Court for Williamsburg County, two days later. To the said foreclosure proceeding the Federal Land Bank was not made a party, and the 30-acre tract of land was sold subject to its prior lien. After the execution of the notes and mortgage by E. A. Simmons and D. H. Oliver, aforesaid, to Kemper Scott, E. A. Simmons was adjudged a bankrupt.

October 22, 1923, Kemper Scott entered into a contract to sell said tract of land to J. P. Newell for $3,000, and

gave J. L. or J. P. Newell bond for title, under which J. L., or J. P. Newell went into possession of said 30 acres of land, the bond for title giving the name of the vendee as J. L. Newell in one place and J. P. Newell in another; and the note for $2,500, for the unpaid purchase money, is signed by J. L. Newell, a son of J. P. Newell; and $500, the cash portion of the purchase price, was paid to Kemper Scott. The bond for title recognized that Kemper Scott's title was not free of incumbrances and provided that the balance of $2,500, due Kemper Scott for said 30 acres of land, should be paid three years after the title to said parcel of land was straightened out (meaning cleared of the Federal Land Bank's mortgage), certain interest to be paid in the meantime, etc.

The 30-acre tract was the western part of a larger tract containing in the aggregate 69½ acres, which two tracts were separated by the track of the Seaboard Air Line Railway Company.

In April, 1924, the Federal Land Bank of Columbia instituted suit through Lee & Shuler, its attorneys, at Kingstree, S. C., for the foreclosure of the mortgage executed to it by E. A. Simmons of the two said tracts of land, and as Simmons was in bankruptcy his trustee was made a party defendant; also Kemper Scott, who had previously purchased the 30-acre tract of land, at the foreclosure sale commenced and prosecuted by the Marion National Bank, was made a party. J. L. Newell was also made a party defendant to said action commenced by the Federal Land Bank, and filed an answer by his attorney, N. N. Newell, setting up his contract of purchase of the 30-acre tract of land from Kemper Scott, and praying that his interest be protected.

The two said tracts of land under the decree of foreclosure in the case of the Federal Land Bank of Columbia against Kemper Scott and others were sold at Kingstree, on the first Monday in October, 1924, and both tracts were bid off by N. N. Newell, attorney, to wit; the 39½-acre

tract of land for $5,300, and the 30-acre tract of land for $500.

The decree of foreclosure required the successful bidder to deposit immediately with the Clerk of Court $500, which would be forfeited upon the bidder's failure to comply with his bid. After the sale, N. N. Newell deposited with the Clerk of Court J. P. Newell's check for $500. The balance of the bid was to be paid by the 10th of October. N. N. Newell had agreed to let Scott have his bid if he, Scott, complied with the terms thereof by the 10th of October. Scott failed to comply on said day. The attorneys for the land bank notified N. N. Newell accordingly, and the land was readvertised for sale.

After Kemper Scott had failed to comply with the terms of the bid N. N. Newell on October 15, 1924, transferred his bid to the 39½-acre tract of land to Mrs. E. A. Simmons for $3,500 and a note to E. A. Simmons for $500, and transferred his bid to the 30-acre tract of land to A. B. and H. F. Newell, for $1,800 in cash and discounted note of E. A. Simmons for $500; the amounts of the bids were paid at once to the Clerk of Court in compliance with the terms of the sale.

Mr. Kemper Scott appeared on October 15, 1924, at Kingstree, S. C., about four o'clock p. m., with a certified check for $5,300, the same day N. N. Newell transferred his bids, but at the time Scott appeared with a check, the transfers had been made by N. N. Newell, Attorney, the amounts of the bids paid, and deeds made by the Clerk of Court to the respective parties. Mr. Kemper Scott then instituted this action, alleging that N. N. Newell acted as his agent in his bids on the two parcels of land, and perpetrated a fraud on him by transferring the bids to other parties, and that they participated in the fraud.

The complaint demands:

"1. That the said deed to the 30-acre tract be set aside and annulled.

"2. That the defendant N. N. Newell be ordered to transfer his bid to plaintiff, and the Clerk of Court be ordered to make deed for said 30-acre tract to plaintiff.

"3. For the costs and expenses of this action.

"4. For such other and further relief as plaintiff may be entitled to and as to justice and equity may appertain."

Answer of J. P., N. N., and J. L. Newell:

The answer of J. P., N. N., and J. L. Newell denies certain material allegations of the complaint and sets up that after the sale of said property, the said defendants met the plaintiff in the office of Lee & Shuler, and N. N. Newell agreed with plaintiff that if he would put up the amount of the bid by Friday, October 10th, he would transfer his bid to him, it being agreed that the plaintiff would give the defendant, J. L. Newell, a bond for title to the said 30-acre tract of land, at the price of $2,000, with the distinct understanding that it would be necessary that the sale be complied with by Friday noon, October 10th. The answer further states that N. N. Newell was notified on October 10th, through Messrs. Lee & Shuler, attorneys for the Federal Land Bank, that the plaintiff had not complied with said agreement and the plaintiff failed to comply, so on October 15th, following, N. N. Newell with the consent of his client transferred to Mrs. E. A. Simmons his bid to the 39½-acre tract of land for $3,500 and $500, note of E. A. Simmons; and transferred his bid to the 30-acre tract of land to A. B., and H. F. Newell, for $1,800, in cash, and discounted a note of E. A. Simmons for $500, and immediately thereupon the full amount of said bid was paid to the Clerk of Court who executed deeds to the said parties.

Answer of A. B. and H. F. Newell:

"The defendants A. B. Newell and H. F. Newell, answering the amended complaint of plaintiff herein, allege:

"I. That they deny Paragraphs 'XIV' and 'XV' of the complaint herein;

"II. That they have not sufficient information to form a belief as to the truth of the allegations contained in the remaining paragraphs of said complaint, and therefore deny the same.

"Further answering said complaint, and as a further defense thereto, these defendants allege:

"1. That subsequent to the date of the sale of the Simmons property, mentioned in the complaint herein, these defendants, acting in good faith, and for valuable consideration, purchased from N. N. Newell, attorney, his bid for the 30-acre tract of land described in the complaint herein, and thereafter complied with the terms of said bid by paying the amount thereof over to the Clerk of Court, who thereupon executed and delivered to them his deed for said 30-acre tract of land; and that they are now the lawful owners thereof, and have no knowledge or information as to the matters and things alleged in the complaint regarding the transactions alleged to have been had between the other parties to this proceeding and the plaintiff herein."

An order of reference was made by his Honor, John S. Wilson, August 29, 1925, directing Henry E. Davis, Esq., as special referee, to take the testimony in this cause and report his conclusions, both of fact and law, to the Court. Pursuant to said order of reference the referee took all the testimony which the parties to the action saw fit to offer, and decided the case in favor of the plaintiff.

The defendants served twenty exceptions to the Master's report; but the Circuit Judge who heard the case overruled all the exceptions and concurred in the findings of the special referee in a decree dated October 20, 1926, and confirmed the referee's report; then on November 2, 1926, his Honor made a supplemental decree, correcting an error in the original decree as to the time for the sale of the 30-acre tract of land.

The defendants appealed from the decree confirming the referee's report to this Court, and served 23 exceptions.

These exceptions impute error to his Honor in confirming the special referee's report in his conclusions of fact and law, and raise the following issues, to wit:

1. Was N. N. Newell acting as agent for Kemper Scott when he bid in the two parcels of land referred to in this case?

2. Did N. N. Newell intentionally and fraudulently mislead the respondent into believing that he represented him as agent in bidding in the two parcels of land?

3. After the sale of the two parcels of land, did N. N. Newell mislead Kemper Scott, or conceal from him any facts, or fraudulently adopt any means that deprived Kemper Scott of the opportunity to secure the bids of the said N. N. Newell?

4. Was the relation existing between the respondent and J. P. Newell such as would preclude J. P. Newell from bidding on said property in person, or by agent?

5. Was there any relation existing between the respondent and A. B. and H. F. Newell, which would preclude the said Newells from taking a transfer of the bid of the 30-acre tract of land from N. N. Newell?

6. Could the respondent attack the official deed made to A. B. and H. F. Newell, in this collateral proceeding, after the sale had been confirmed?

7. Would it be equitable and just to any or all of the defendants concerned, to allow Kemper Scott to come in and demand a deed to the 30-acre tract of land for $500, and require N. N. Newell to lose the difference between the price he paid for the 39½-acre tract of land, and the price he received for it, to wit, $1,300?

8. Did Kemper Scott lose the bids to the two parcels of land by his own lack of vigilance, and by his gross negligence in failing to comply with the bids as required by the terms of sale and the agreement between him and N. N. Newell?

A decree overruling or confirming a Master's conclusion of fact in a law case, is as binding on the Supreme Court as the verdict of a jury. *United Timber Co. v. Mullins,* 142 S. C., 477; 141 S. E., 15.

This principle does not apply to the case under consideration for it is a case in chancery, and if the concurrent findings of the referee and trial Judge are against the clear preponderance of the testimony, this Court has the power to review the findings. *Gibbes Machinery Co. v. Hamilton,* 100 S. C., 59; 84 S. E., 296.

### ISSUE 1

Agency involves a question of fact. *Hopkins v. Smathers,* 114 S. C., 488; 104 S. E., 30.

The following excerpts from the testimony are material:

For the plaintiff: Witness Kemper Scott.

At folio 100 of the transcript of record he says—

"I turned to Mr. Newell and said will you bid it in? He give me to understand he would. After that Mr. Newell and Mr. Shuler talked together, but I could not understand, or hear all they said, nevertheless the impression was given to me that $5,300, would cover the entire costs. * * *"

At folio 102:

"Q. So when the bidding took place, the understanding you had with N. N. Newell was that he would run it to $5,300 if necessary, and thus clear the title to the thirty-acre tract? A. My understanding, yes, sir."

At folio 103, Mr. Scott further says:

"He told me that he had bid in the property for me, and that it was necessary to put up a cashier's check for $500."

At folio 106A:

"After we had dinner and came back to the office Mr. N. N. Newell, Mr. Shuler and Mr. Lee, and I don't know how many more, them three I saw, was back in the second room from the front entrance. I stayed in the first one—

don't remember that anybody else was in the same room where I was. The door was closed between the three men I spoke of; Mr. N. N. Newell and Messrs. Lee & Shuler. They were in there probably twenty or thirty minutes. Finally Mr. Lee opened the door and beckoned to me, and I went in there. He said to me that I can hold this matter open until Friday next. I told him, 'Mr. Lee, that gives me mighty short time; that it will be tomorrow night before I can get him and that makes it Wednesday before I can get to my attorney. It gives me short time, but I will do the best I can.' And that was about the wind up of the conversation. I asked Mr. Newell to give me a statement of this so I could take it to Mr. Johnson, which he did."

Copy of paper handed to Kemper Scott by N. N. Newall:

"MEMORANDUM

"Send Cashier's check, $4,800.00.

"Receipt for, $500.00.

"Settlement must be made by Friday noon, Oct. 10th."

Folio 120:

"Q. What time of day did we get here? A. Some time along about four o'clock in the afternoon. I am not sure as to the exact minute, but some time along about that time.

"Q. So when you came here you went to the clerk's office? A. Yes, sir.

"Referee: What date was that? Witness: Wednesday, October 15th.

"Q. I went with you, did I? A. Yes, sir.

"Q. And I don't know whether you heard, but if you did tell what you heard? A. I heard you say that they had deed to the property. You were talking with the other people in the office, but I couldn't understand any of your conversation. You and Mr. Newell were talking, I know.

"Q. You did learn that the property had been sold, that the Clerk of Court had made deeds to the thirty acres and to the other tract also to some of the Newells? A. Yes,

sir; I got sufficient of the conversation to understand that the property had already been deeded away—had already been sold."

Folio 125:

"Q. Before the sale did Mr. N. N. Newell tell you that he would bid for you at the sale? A. He either said 'yes' or nodded affirmative—I don't remember which."

Folio 128:

"Q. Mr. Newell didn't exactly agree that he would bid for you, did he? A. Why, I wouldn't say, but he might have said 'yes,' or he might have affirmed by a nod—he would bid for me.

"Q. You had never seen Mr. Newell before that time? A. That was the first time I ever saw him in my life to know him.

"Q. Did you and Mr. Newell have any agreement as to how much you were to pay him? A. No, sir; nothing was said along that line.

"Q. Did you ask him after the sale how much you owed him? A. No, sir; we had not got to a final settlement.

"Q. Now, after dinner in Mr. Lee's office, you understood that you had only complied to put up the money? A. That's what Mr. Lee said.

"Q. Mr. Newell told you that you would have to have the money here by Friday? A. Mr. Newell and myself didn't have any conversation. I don't believe that we had any conversation at all—I don't remember. There was very little talking done, and the talking was entirely between me and Mr. Lee after dinner."

Folio 133:

"Q. Didn't at the same time and place, Mr. N. N. Newell tell you that he was representing his uncle at the sale? A. I knew that.

"Q. Now, before you left Kingstree on the afternoon of the 6th of October, didn't you tell Mr. N. N. Newell that

you couldn't agree to anything until you saw your attorney?"

Folio 140:

"Q. After that, then, you told Mr. Newell you would have to see your attorney first? A. That was before any sales took place. Newell and me had very little talk. I don't believe we had any before the sale."

Mr. E. L. Ard, attorney at law, testified as to a transaction between Kemper Scott and J. L. and J. P. Newell, relative to a note and bond for title involving the thirty-acre tract of land.

W. L. Lawrimore, among other things, testified (page 42 of the transcript):

"Saw Kemper Scott at the sale walking around the courthouse; saw him after the sale talking with Mr. Newell. I heard Mr. Newell, referring to Mr. N. N. Newell, say you can still let Uncle Joe have the place. * * *"

Page 43:

"Drove out to see Mr. J. P. Newell, told him my business. He said, 'Well, I don't know whether Norval can sell that place or not. Him and Mr. Scott are mixed up on that place.' And he further said, that Mr. Scott had been up there and didn't have the $500 to put up as security, and he did not know what he was going to do. I told Mr. J. P. Newell that 'if that was Mr. Scott's bid I don't believe you can sell. He says that the bid was in his name, and he could transfer it, and the Clerk of Court could give you a title.' "

Page 44:

"Mr. J. P. Newell said he had bid it in for Mr. Scott," referring to Mr. N. N. Newell.

Witness Shuler—Page 45:

"The land covered by the Scott mortgage was the 30-acre tract of the Simmons land lying on the west side of the Seaboard Air Line Railroad. In following this matter further, I found that Mr. Scott had entered into a contract

of some kind with Mr. J. L. Newell by which he was to convey to Mr. Newell the 30-acre tract for three thousand dollars.   *   *   * "

Page 47:

"Mr. Kemper Scott came in the office and I introduced him to Messrs. Newell.   *   *   *   I suggested that they should get together as to how to bid on the property.   I then left them in the front room of our office, and closed the middle door, and I don't know what their understanding was."

Page 48:

"After the sale was over, Mr. Newell and Mr. Scott came to our office, and we discussed the method of closing the sale.   It was agreed that Mr. Scott would have in the hands of the Clerk of Court, or in our hands, I don't recall which, the sum of fifty-three hundred dollars by Friday, of that week, that is by midday, and if he did not have that amount in our hands, or the hands of the Clerk of Court, by twelve o'clock on Friday of that week, it was understood that I would immediately notify Mr. Newell.   I understood that Mr. Scott would either have a check sent, or would come and bring it, on that day.   Mr. Scott did not come on Friday, and I immediately called Moncks Corner to notify Mr. Newell.   This was done shortly after midday.   N. N. Newell was notified that Scott had not complied with the bid.   Newell came in the office on Friday afternoon, Saturday or Monday, and told me he was making an effort to obtain the money with which to close the sale.   We were urging him to do his best.   *   *   *   It seems to me that the sale was closed on Wednesday, the 15th."

Mr. Shuler further testified as to his effort to get the sale closed, and of receiving a telegram from Mr. Johnson, attorney for Scott, dated October 13th, and that he thought he communicated the contents of that telegram to N. N. Newell before the sale was consummated by the execution

of the deeds.    The telegram stated that Scott would comply before Thursday, but he did not.

Page 56:

"Q. Do you recall whether you advertised the property the next week?    A. I believe the notice was prepared and came out in one issue.    In other words, my recollection is, trying to play safe with the bank."

Page 58:    Mr. L. H. Douglas testified that he took Scott over to J. P. Newell, and he had a talk with J. P. Newell's sons, and corroborates what Scott says took place there.

Mr. J. A. Wilder testified, in substance, that he went with Kemper Scott to the sale, and heard no conversation between N. N. Newell and Scott until after the sale; and that five or ten minutes after the sale Newell spoke to Scott about putting up the $500 and Scott replied that he did not do any banking business over here, and applied to J. P. Newell for the money and J. P. Newell agreed to let him have it.

Mr. Jas. W. Johnson, attorney for Scott, at page 60, *et seq.,* gave a full history of the transaction as far as it was within his knowledge.

Defendant's testimony:

Dr. E. A. Simmons, at page 67 of the transcript, testified as to negotiations between him and N. N. Newell for the sale to him of the 39½ acres, and the closing of the transaction.

Mr. R. H. McElveen, at page 69 testified as to negotiations of J. P. and N. N. Newell to borrow money from Farmers' & Merchants' National Bank, at Lake City, in October, 1924.

N. N. Newell testified for himself, beginning at page 71, giving his version of the transaction in support of the allegations of his answer and a part of his testimony beginning at folio 298 reads as follows:

" * * * We then went into Mr. Lee's office and I told Mr. Lee what we were to do, and that I was to prepare

a new bond for title and send to Mr. Johnson to be executed by Scott, and he was to send the bond for title and the forty-eight hundred dollars and a receipt for five hundred dollars to Lee & Shuler by Friday, 12 o'clock, and Mr. Lee was to telephone me at 12 o'clock whether it had been done or not, and if it had I could run over here and transfer the bid.    When we came out of Mr. Lee's office—

"Q. Just a second, Mr. Newell if he did not have the money here, what were you to do?    A. If he didn't have the money here all his rights were forfeited, and he had no further rights therein.    Mr. Scott asked me to mark down the amount that he must raise, and I tore off a little piece of scratch paper and wrote it down.    This piece of paper has been offered in evidence.    Mr. Lee had a stronger voice than I did, and I asked him to explain the matter fully to Mr. Scott, which he did in my presence, and it was thoroughly understood that Mr. Scott must be here by Friday, 12 o'clock, or everything would be off with him.    My purpose was, that if Mr. Scott failed, then it would give us an opportunity to raise the money otherwise."

Mr. E. L. Hirsch, at folio 369, testified:

"A. I didn't pay much attention.    I notice three of them sitting there.    I heard Mr. Newell say in a loud voice, 'I bid this property off for my uncle,' and I recall that I met Mr. Newell on the street and said 'what were you and that old man doing, I thought you were going to fight,' and he said 'that old man is deaf.' "

Mr. J. D. Britton, Clerk of Court, at folio 372, testified:

"Q. Did you discuss with Mr. Newell anything at that time with reference to the Simmons property?    Attorneys for plaintiff:    We object.

"Q. Did he at that time say who he was going to bid the property in for if it didn't go above a certain amount?    A. Yes, sir.

"Q. And did he say who he was going to bid it in for? A. He said he was going to bid the property for, I think he

said, Uncle Joe, if it didn't go above a certain amount."

Mr. N. N. Newell, recalled, testified as follows (folio 375):

"Q. Mr. Newell, when you closed this transaction on the 15th of October, did you at that time know that Mr. Scott was claiming any interest in the property you bid? A. No, sir.

"Q. In transferring these bids as you did, was that in accordance with your client, Mr. J. P. Newell's wishes in the matter? A. It was agreeable with him."

Mr. LeRoy Lee, at folio 380 *et seq.,* testified:

"I remember distinctly saying to Mr. Scott that he must have the money in our office, I think, by midday on Friday, and I think the amount was fifty-three hundred dollars. Now, according to my recollection, if he didn't have that, we were to notify Mr. Newell—that's the sum and substance of the understanding so far as I recall it.

"Q. Do you know why you were to notify Mr. Newell? A. We were to notify him so that Mr. Newell could go on and get the money and comply with the purchase."

On page 96 of the transcript is fully explained the arrangement that he and N. N. Newell had relative to the bidding on said lands:

"A. Yes, sir, I remember having to speak very loud to him and put my mouth close to his ear—I know Mr. Scott remembers that, too. I have that distinct recollection.

"Q. Would you say that Mr. Scott understood fully that he had to have this money here by twelve o'clock noon on Friday, else someone else, Mr. Newell, would make other arrangements? A. I will say this: Mr. Scott—I am speaking about my understanding, I can't say what his was —I will say that Mr. Scott was advised that if he did not have that money here by that time we would notify Mr. Newell, and Mr. Newell would go ahead and close the thing, I will say that."

There are twenty-three exhibits in evidence, and while they slightly elucidate the transaction, the principal evidence that has influenced the Court is the parol.testimony of Scott, N. N. Newell and other witnesses, and the conduct of Scott and N. N. Newell after the land was bid in by Newell.

Kemper Scott was not only hard of hearing, but very hard of hearing, and it was so easy for him to misunderstand N. N., Newell; in fact was not definite and certain in his testimony that N. N. Newell was to bid in the land for him, but testified that he understood that N. N. Newell was to bid it in for him. He also testified that he knew that N. N. Newell was attorney for J. P. Newell.

We think that the conclusion of the referee that N. N. Newell bid in the land as the agent for Kemper Scott was against a clear preponderance of the testimony, and that the chancellor erred in not sustaining the exceptions to the findings and conclusions of the referee on said issue of agency.

Mr. LeRoy Lee was positive in his testimony that he gave Scott notice that he must have the money for the land in his office by midday on Friday following, which was October 10th.

The memorandum given Scott by Newell was definite and was without ambiguity.

When is a transaction fraudulent?

5    Issues 2 and 3 are very similar, and will be considered together.

"Fraud is where one deceives another and causes him to do something which he would not otherwise have done by misrepresenting a fact, by making a false statement, or by failing to speak when equity and good conscience require one to speak." *Sloan v. Lee et al.,* 121 S. C., 429; 114 S. E., 408.

The suppression of the truth, with misleading suggestions, may be as effective to create an erroneous or false impression as a direct falsehood. *Welborn v. Cobb,* 92 S. C., 393; 75 S. E., 691.

"When a promise is made with no intention of performance, and for the very purpose of accomplishing a fraud, it is a most apt and effectual means to that end, and the victim has a remedy by action or defense." *Palmetto B. & Trust Co. v. Grimsley et al.,* 134 S. C., 493; 133 S. E., 437; 51 A. L. R., 42.

Fraud is a state of mind dependent on intent which is provable by circumstantial evidence. *Parham v. Insurance Co.,* 111 S. C,. 37; 96 S. E., 697.

In *Donaldson v. Temple,* 96 S. C., 242; 80 S. E., 438, it is held:

"Whether the fraud be alleged in the declaration, complaint or bill, or set up by way of defense in pleas, answer or replication, it is essential that the facts and circumstances which constitute it should be set out clearly, concisely and with sufficient particularity to apprise the opposite party of what he is called upon to answer. *State v. Jaques,* 65 S. C., 184; 43 S. E., 515. *Gem Chemical Co. v. Youngblood,* 58 S. C., 56; 36 S. E., 437.

In *Coleman v. Stevens,* 124 S. C., 8; 117 S. E., 305, this Court held:

Syl. 3. "An instruction that deceit or fraudulent representations to be actionable must relate to existing or past facts, and the failure to perform a promise does not in and of itself constitute fraud, or evidence of fraud, held not error as being a charge on the facts, in view of the other instructions."

Syl. 4. "A mere violation of a contract will not support an allegation of fraud."

Where one acts within his legal rights fraud will not be implied. *Tolbert v. Roark,* 126 S. C., 207; 119 S. E., 571.

If testimony is indefinite, and not positive and clear, fraud should not be inferred. *Talbert v. Talbert,* 97 S. C. 136; 81 S. E., 644.

Both constructive and actual fraud are charged in this case. This complaint attacks N. N. Newell and others for fraud—it attacks their characters, their souls.

The testimony in the case is far insufficient to show fraud on the part of N. N. Newell or the other defendants.

How can it be concluded that N. N. Newell intended to mislead Kemper Scott, in the light of the admitted testimony, that after N. N. Newell had bid in the parcels of land, he agreed to transfer his bid to Scott, if Scott would comply with the terms of sale? Mr. Lee, the attorney for the Federal Land Bank of Columbia, says this, and Scott admits it; the memorandum given Scott by N. N. Newell corroborates it. Before this testimony any possible bad motive and all scienter vanish on the part of N. N. Newell.

The charge of fraud is a very serious charge, and to sustain it the proof should be complete. There is no evidence of fraud in this case; no inference from the acts and conduct of N. N. Newell, and other defendants, can be construed as fraudulent; hence, the Chancellor erred in failing to sustain the exceptions to the Referee's report on those issues.

### Issue 4

It appears that Kemper Scott had given bond for title to J. L. Newell; but the plaintiff contends that J. P. Newell was the purchaser of the land; however, this Court does not think the investigation of that matter is within the scope of the pleadings. There would be no reformation of the bond for title without consent of the parties, and if J. P. Newell imposed upon Kemper Scott in the transaction, or if there was mutual mistake of fact, such issue, or issues must be settled in some other case. If, however, the relation of vendor and vendee as to the 30-acre tract of land existed between Kemper Scott and J. P. Newell, this relation could not preclude Newell from bidding at the mortgagee's sale.

Kemper Scott was a party to that foreclosure proceeding; under the decree any person had the right to bid at that sale; and as that sale extinguished all right and title that Kemper Scott had in the 30-acre tract of land and an eviction of Newell holding under Scott must of a necessity follow. Newell, for his own protection when his vendor's title was being extinguished, certainly had the right to purchase at said mortgagee's sale. *Barnes v. Lyles,* 110 S. C., 465; 96 S. E., 723. *Anderson v. Butler,* 31 S. C., 183; 9 S. E., 797; 5 L. R. A., 166. In *Wilson v. Carr et al.,* 141 S. C., 60; 139 S. E., 171, this Court held: "A purchaser should be allowed to secure such a title as in reason he intends to secure, unless there should be a palpable failure on his part to exercise ordinary care to protect himself."

The principle announced in *Bradley v. Calhoun,* 125 S. C., 70; 117 S. E., 811, is not applicable to the facts of this case.

The principle is laid down in *Williams v. Bruton et al.,* 121 S. C., 31, Syl., 5; 113 S. E., 319, "Where cotenants held under the same title, one cannot, without the consent of the others, buy in an adverse claim or title and assert it for his exclusive benefit against the others." But that principle cannot avail respondent in this case.

The consideration of this issue was really disposed of in the consideration of issue 1, but as the point was made we have considered it.

### ISSUE 5

There is nothing in the record that can possibly be construed as precluding A. B. and H. F. Newell from purchasing the bid from N. N. Newell, attorney, on the 30-acre parcel of land.

### ISSUE 6

The question is raised whether the respondent could 7–10 attack the official deed made to A. B. and H. F. Newell, by the Clerk of the Court, after the sale had

been confirmed, in the form of the action in this case.

There are three ways of attacking a judgment: (a) Collaterally; (b) directly; (c) action on the equity side of the Court.

A judgment may be attacked collaterally only when its defects and infirmities are apparent by an inspection of it. *Findley v. Robertson,* 17 S. C., 435. *Tederall v. Bouknight,* 25 S. C., 275. *Turner v. Malone,* 24 S. C., 398.

A direct attack is made by motion on notice in the same case with the same parties. *Crocker v. Allen,* 34 S. C., 452; 13 S. E., 650; 27 Am. St. Rep., 831. In the case of *New York Life Ins. Co. v. Mobley,* 90 S. C., 552, Syl. 2; 73 S. E., 1032, this Court held:

"A jurisdictional defect, which does not appear upon an inspection of the record, does not render the judgment void, but only voidable, and any proceeding to have the judgment declared a nullity, other than a motion in a cause, must be regarded as a collateral attack on the judgment."

In *Patterson v. B. & A. Mortgage Co.,* 112 S. C., 210; 99 S. E., 830, this Court held:

"It is undoubtedly the policy of the law to maintain judicial sales, whenever it can be done without violating principles or doing injustice; and in this view it is held that a purchaser at such sale is in no way responsible for mere irregularities in the proceedings, or even error in the judgment, under which the sale is made."

The relief sought in this case is to set aside the deed made to A. B. and H. F. Newell, and to set aside the order confirming the sale, and the confirmation provided by No. 84, Act of 1923, and to have a deed made to plaintiff.

An attack on a judgment, or order, on the equity side of the Court, upon equitable grounds, is recognized in the following cases: *Crocker v. Allen, supra,* page 461 (13 S. E., 650). *Ruff v. Elkin,* 40 S. C., 69; 18 S. E., 220. *Life Insurance Co. v. Mobley,* 90 S. C., 561; 73 S. E., 1032. *Tolbert v. Roark,* 126 S. C., 218; 119 S. E., 571; 15 R. C.

L., 730, Par. 182. *Sloan v. Hunter,* 56 S. C., 385; 34 S. E., 658, 879; 76 Am. St. Rep., 551.

An attack on the deed of the Clerk of Court and confirmation of the sale, and for an order requiring the Clerk of Court to convey the land to the plaintiff, by motion on notice to set aside the deed and confirmation of sale, would not have been an appropriate remedy in this case.

The form of the proceeding in this case is correct, and the cases of: *Coogler v. Crosby,* 89 S. C., 508; 72 S. E., 149. *Barnes et al. v. Leevy et al.,* 112 S. C., 426; 100 S. E., 169. *Baker v. Brewer,* 129 S. C., 74; 123 S. E., 771, are not in point; hence, all exceptions to the form of the proceeding herein are overruled; but the plaintiff failed to establish his cause of action.

## ISSUE 7

The testimony shows that N. N. Newell, attorney, agreed to transfer his bid on the two parcels of land to Kemper Scott, provided Scott complied with the terms of sale, but this he failed to do.

The larger parcel of land above described seems to have sold for its full value, and the 30-acre tract desired by Scott for very much less than its real value.

He that seeks equity must do equity.

Would it be right and just to let Kemper Scott have the smaller tract of land for one-fourth its value, and thereby entail upon N. N. Newell a loss of around $1,300, in the transaction?

Scott's action is relative only to the smaller tract of land, and does not seek to acquire both tracts upon the terms of sale and agreement made with N. N. Newell, attorney. Equity cannot countenance the relief demanded by Scott in this case.

## ISSUE 8

Scott had ample opportunity to comply with the terms of sale of the two parcels of land, and acquire the bids of N. N. Newell, attorney, but he did not seize

this opportunity, and although he had notice from N. N. Newell and from Mr. Le Roy Lee that he must comply with the terms of sale by the following Friday, October 10th, he neglected to do so until October 15th, about 4 o'clock in the afternoon, after the land had been advertised for sale, and after N. N. Newell, attorney, had transferred his bids in the morning of that day. Scott has only himself to censure for his failure to acquire the bids to the said parcels of land.

It is held in the case of *Colt v. Britt,* 129 S. C., 226; 123 S. E., 845, substantially, that recklessness of a plaintiff in a transaction may be set up as a defense by the defendant for fraud perpetrated by him on the plaintiff in such transaction. Every person, notwithstanding a wrong committed upon him by some other person, must exercise reasonable prudence and diligence in the premises for his own protection. In this case Scott was guilty of recklessness in his failure to comply with the terms of sale and the agreement N. N. Newell had with him, and this recklessness was the proximate cause of his loss of said bids; and he cannot now blame N. N. Newell for his own fault.

For the reasons aforesaid, the judgment of the lower Court is reversed, and the complaint in this action dismissed.

MESSRS. JUSTICES BLEASE and STABLER concur.

MESSRS. JUSTICES COTHRAN and CARTER dissent.

MR. JUSTICE COTHRAN (dissenting) : I think that the special referee has reached the justice of this case, and therefore respectfully dissent from the opposite conclusion announced in the opinion of Mr. Acting Associate Justice Thurmond, for the reasons which follow. The case is quite complicated, and at the risk of repeating what is said in the leading opinion and in the report of the special referee, I shall give my very decided impressions of it.

It appears that one E. A. Simmons, in October, 1921, owned two tracts of land in Williamsburg County, which for convenient reference I shall designate as tract No. 1 and

tract. No. 2. The two tracts are adjacent, being separated by the Seaboard Air Line Railway; tract No. 1, containing 39½ acres, lies on the eastern side of the railroad, and tract No. 2, containing 30 acres, on the western side. On October 31, 1921, Simmons executed a mortgage to the Federal Land Bank upon both tracts No. 1, 39½ acres, and No. 2, 30 acres, to secure a certain obligation for borrowed money in the sum of $4,500. This mortgage was duly recorded.

Prior to October, 1921, in the fall of 1919, Scott had purchased from Simmons and Oliver certain other property near Hemingway, S. C., and paid $6,000 cash for it. Later Scott ascertained that there was a prior mortgage of about $4,500 upon the property, not the Federal Land Bank mortgage just referred to.

Upon Scott's complaint and demand for a return of his money or security therefor, on November 12, 1921, Simmons and one Oliver (who I assume had acquired an interest in the land from Simmons) executed to Scott four notes of $1,280 each, aggregating $5,120, secured by a mortgage upon tract No. 2, 30 acres, to protect him from the undisclosed prior mortgage above referred to (not the land bank mortgage). Later, it appears that Scott assigned one of the $1,280 notes to the Marion National Bank. In April, 1923, the bank foreclosed the mortgage, and at the sale Scott became the purchaser of tract No. 2, 30 acres, complied with his bid, and received the deed of the clerk of Court who made the sale therefor, dated May 21, 1923, recorded May 23d.

To the bank's foreclosure proceeding the Federal Land Bank, which, as stated, held a prior mortgage upon tract No. 2, 30 acres, as well as upon tract No. 1, 39½ acres, was not made a party. Scott's title to tract No. 2, 30 acres, was therefore subject to the prior mortgage of the Federal Land Bank.

On October 22, 1923, Scott, who held the title to tract No. 2, 30 acres, entered into a contract with the defendant,

J. P. Newell, for the sale to him of that tract for $3,000, and executed to him a bond for titles, obligating Scott, after having received a cash payment of $500, to execute a deed to J. P. Newell of the tract, three years after Scott should have relieved the tract of the Federal Land Bank mortgage, which was recognized as a prior lien upon the tract, at least to the extent of such deficiency as might result after applying the proceeds of the sale of the other tract, No. 1, 39½ acres, which the land bank mortgage also covered. J. P. Newell made the cash payment of $500 and went into possession of tract No. 2.

In April, 1924, the Federal Land Bank commenced an action to foreclose its mortgage upon both tracts, No. 1 and No. 2, given, as stated, by Simmons in October, 1921. All interested parties were made defendants to that action, the trustee in bankruptcy of Simmons, Scott, J. P. Newell and J. L. Newell. A decree of foreclosure and sale was entered in this action of the land bank, directing that the land be sold in two parcels, tract No. 1 first and No. 2 second.

The sale was had at Kingstree on October 6, 1924; both tracts were knocked down and charged to N. N. Newell, attorney, at initial bids of $5,300, for tract No. 1, and $500 for tract No. 2. The decree of foreclosure required the successful bidder to deposit immediately with the Clerk of Court, the officer who was making the sale, $500, which should be forfeited upon the bidder's failure to comply with his bid. *The decree does not provide the time within which such compliance should be made.*

After the sale N. N. Newell, who had bid the property off "as attorney," deposited with the Clerk of Court a check for $500, drawn by J. P. Newell upon his bank. There is a controversy between the parties as to whether this deposit was made for J. P. Newell or for Scott. This depends upon the legitimate inferences to be drawn from the circumstances under which it was deposited, and will be discussed later in connection with the paramount issue in the case, whether

N. N. Newell in bidding off the property was acting for J. P. Newell or for Scott.

It is stated in the leading opinion: "The balance of the bid was to paid by the 10th of October" (the Friday after the sale on Monday the 6th). I do not find anything in the decree of foreclosure, in the advertisement, in the announcement at the sale or in any statement emanating after the sale from the clerk, which tends to give even color to this statement.

It is idle to suggest that there was a contract between N. N. Newell and Scott, by which Scott's interest in the bid was to expire if not complied with by October 10th. N. N. Newell does not contend that he fixed that as the limit; as a matter of fact he was in no position to fix anything, certainly not to bind his principal Scott. I have never heard before of an agent binding his principal to a renunciation of the latter's interest in a contract entered into by the agent for him and a transfer of those rights to the agent. Mr. Johnson put it very aptly in his question to Mr. Shuler:

"Q. Didn't I then say to Mr. Lee: Mr. Lee, a lawyer cannot represent a man at a sale and then undertake to impose conditions on his client afterwards?"

The truth of the matter is that naturally Messrs. Lee & Shuler, representing the land bank, were insistent upon the transaction being closed immediately; and they were the ones who set October 10th as the settling day. That was more than even they were authorized to do, for every purchaser at a judicial sale is entitled to a reasonable time within which to examine the title to the property. They recognized the fact that they could not fix a definite time for compliance; for they later extended it to October 13th, and even later than that on October 15th, accepted settlement.

What right did N. N. Newell have either to assign his bid or to impose conditions upon such assignment? He was certainly acting as agent for one or the other, J. P. Newell or Scott; if for J. P. Newell, he was without authority

to barter away his principal's rights without consulting him; if for Scott, his agency obviated the necessity of an assignment to Scott; certainly as agent, he had no right to impose conditions of any kind upon his principal.

Immediately after the sale, N. N. Newell gave to Scott a slip of paper purporting to show the amount of money Scott would have to raise in order to comply with the bid. The memorandum, in the handwriting of N. N. Newell, read as follows:

"Send Cashier's check                          $4,800.00
"Receipt for                                       500.00
"Settlement must be made by Friday noon, Oct. 10th."
. This was clearly an erroneous statement, in that it omitted the $500, the bid on tract No. 2. The statement should have called for a cashier's check for $5,300, and a receipt to be delivered to J. P. Newell for the $500 cash payment at the sale. It was so construed by Mr. Johnson in providing the check for $5,300. Evidently the "receipt for $500.00" referred to the $500 check which J. P. Newell had turned over to N. N. Newell for the purpose of complying with the cash terms of the sale, and contemplated manifestly that if Scott raised the $5,300 (which was the amount of the bids, $5,800, less the $500 check of J. P. Newell), and gave J. P. Newell a receipt for the $500 to be credited upon his obligation to Scott, title deed would be executed by the Clerk of Court and delivered to Scott.

On Wednesday, October 8th, Scott sent a telegram to J. P. Newell requesting him to wire his attorney, J. W. Johnson, Esq., at Marion, S. C., the amount of money that he could raise to apply upon J. P. Newell's obligation to him. To this telegram there was no reply. On Monday, October 13th, J. W. Johnson, Esq., sent a telegram to N. N. Newell, to the effect that Scott would be ready to comply by Thursday, October 16th.

On the same day, October 13th, Monday, J. W. Johnson, Esq., sent a telegram to Messrs. Lee & Shuler, who were the

attorneys for the foreclosing mortgagee, Federal Land Bank, and who were taking steps to re-advertise the sale, stating that he had sent Scott to them in pursuance of their offer to look after his client's interest at the sale; that he was relying on them to protect Scott's interest, and that he did not think there was any doubt that Scott would comply before Thursday.

On Tuesday, October 14th, J. W. Johnson, Esq., wrote a letter to N. N. Newell, that he would be in Kingstree on the following Thursday morning, the 16th, to close up the matter, and requesting him, if not convenient to meet him there, to mail to him, care of the Clerk of Court at Kingstree, a transfer of his bid. N. N. Newell declares in his testimony that he was absent from his office and did not personally receive either the telegram of the 13th or the letter of the 14th, until after October 15th, although he admits that he had a stenographer in his office during this period, and was at his home the nights of the 13th and 14th.

N. N. Newell is badly mixed as to his movements on Monday and Tuesday, the 13th and 14th. He testified that he spent Monday, the 13th, in Charleston, and was in Kingstree all day Tuesday, the 14th. In his letter to Messrs. Kelly & Hinds dated January 3, 1925, he says:

"Relative to telegram by Mr. Johnson to me, I am informed that same was delivered to my office about eleven o'clock on Tuesday. I was in Charleston on that day and did not get back until after night, and left at 5 o'clock the next morning to go to Lake City to see if I could raise the money to comply with the bids. Therefore I actually knew nothing about the telegram until Mr. Johnson accused me of having received it, and then getting in an awful hurry."

On Wednesday, the 15th, N. N. Newell went from his home at Moncks Corner to Kingstree, apparently unaccompanied, and about noon of that day transferred the bid which stood in his name as attorney, on tract No. 1, 39½ acres, to Mrs. E. A. Simmons, wife of E. A. Simmons and aunt

of N. N. Newell, for $3,500 cash, and note of E. A. Simmons for $500, and his bid on tract No. 2, 30 acres, to the defendants A. B. Newell and H. F. Newell, sons of J. P. Newell, for $1,800 cash which put in his hands $5,300 cash. That amount was paid by him to the Clerk of Court, in compliance with the terms of sale, and deeds by the Clerk of Court to Mrs. E. A. Simmons for tract No. 1, 39½ acres, and A. B. Newell and H. F. Newell, for tract No. 2, 30 acres, were duly executed and delivered, respectively, to them.

Later on the same day, Wednesday, October 15th, about 4 p. m., Mr. Johnson and Mr. Scott appeared at Kingstree, a day before they expected to appear, prepared with a cashier's check for $5,300, to close the transaction by the payment of that amount to the clerk and the execution of a deed by him conveying both tracts to Scott. They soon ascertained what N. N. Newell had done earlier in the day, and were at their "row's end," except to seek relief as they have done in this action.

In effort to "knit up" this tangled "slieve," which I regard in its essence, as a controversy betwen Scott and J. P. Newell, the relative situations of these two parties are of great moment. A consideration of their respective interests is the key to the truth of the matter in dispute.

Actually, Scott was under a bond for titles to J. P. Newell which obligated him to convey tract No. 2, 30 acres, free of the incumbrance of the land bank mortgage, to J. P. Newell, upon the payment by him of $2,500; practically, Scott held a second mortgage upon the tract by J. P. Newell, subject to the prior land bank mortgage. The land bank mortgage covered tract No. 1, 39½ acres, as well as tract No. 2. Scott, under the two-fund doctrine, had the right to require the land bank to exhaust tract No. 1 before resorting to tract No. 2, which was liable only for the deficiency after applying the proceeds of the sale of tract No. 1 to the mortgage debt. This right was distinctly recognized in the foreclosure decree, which ordered tract No. 1 to be

first sold.   It was therefore to Scott's interest to make tract
No. 1 bring enough to satisfy the land bank mortgage, which
would relieve tract No. 2 therefrom, and make his mortgage
upon tract No. 2 perfectly good.   *This he expressed himself
as willing and determined to do.*   Naturally, in making prep-
arations to carry out this purpose, if he could supplement
with what J. P. Newell owed him on tract No. 2, 30 acres,
he could more readily raise the necessary amount, $5,300.
Accordingly, as soon as he received notice of the pending
sale, he applied to J. P. Newell to know how much money he
could raise upon his $2,500 obligation by that time.   He
received a reply from J. P. Newell, dated September 23rd,
two weeks before the contemplated sale on October 6th, that
he could raise $500 out of his own resources, and had the
promise of a loan of $1,000 additional.   (This letter is a
pregnant fact bearing upon the question, which will be dis-
cussed later, as to who furnished the $500 cash payment at
the time of the sale and from whom.)

J. P. Newell did not have the slightest idea of purchasing
tract No. 1, 39½ acres; his activities were limited to raising
as much as he could to pay Scott upon his $2,500 obligation,
with the concerted purpose of relieving tract No. 2, 30 acres,
from the land bank mortgage, thus enabling Scott to make
him a clear title to tract No. 2.

Now, approaching the question of prime importance in the
case: *Whom was N. N. Newell acting "as attorney" for, in
bidding upon the property at the sale?*

It is necessary to turn the hands of the dial backward for
a space.

By letter dated September 22d, Messrs. Lee & Shuler,
attorneys for the foreclosing mortgagee, the land bank, ad-
vised J. W. Johnson, Esq., attorney for Scott in the fore-
closure proceeding, that the sale would be had on October
6th, and added: "If we may be of any service to you in
looking after your client's interest at the sale, we shall be
glad for you to let us know."   As a matter of course, Mr.

Johnson did not expect these gentlemen to forget the interests of their clients in the matter, but in matters not conflicting with those interests, he was justified in acting upon the offer. Acordingly Mr. Johnson did not go to Kingstree on the day of the sale, but instead sent Scott, directing him to go to Messrs. Lee & Shuler (who had previously represented Scott in another matter), and to request them to protect his interests at the sale. Scott did so, and entering the office of Messrs. Lee & Shuler, on the morning of the sale and before the sale, about 10:30 a. m., found Mr. Shuler, J. P. Newell and N. N. Newell in conversation. He then, as he had been directed by Mr. Johnson, his attorney, to do, requested Mr. Shuler to give him a statement of the total amount, including costs, due under the decree and asked him to bid the property in for him. Mr. Shuler, upon the ground that he represented an adverse interest, declined to do this, after stating to Scott the amount due.

In the language of Mr. Shuler, this is what followed:

"I then told them that, under my view of the matter, his interest and the interest of Mr. J. L. Newell were identical, and I suggested that they should get together as to how they should bid on the property. I then left them in the front room of our office and closed the middle door, and I don't know what their understanding was. They discussed the matter some few minutes, and later Mr. Newell and I had a further brief conference about how the bidding should be handled—this was out near the Court house just before the sale. The agreement was that Mr. Newell should bid fifty-three hundred dollars, or as high as fifty-three hundred dollars if necessary, for the 39½-acre tract lying east of the railroad, and that he would bid five hundred dollars for the thirty-acre tract lying west of the railroad. This total bid of fifty-eight hundred dollars would be sufficient to take care of all of the costs, expenses of the proceeding, any taxes due on the property, and the full amout due the Federal Land Bank of Columbia."

In the referee's report the following account of what happened is given:

"About this time, Mr. N. N. Newell came in, and at the suggestion of Mr. Shuler, Scott requested Mr. Newell to bid in the property for him. Scott's version is that Mr. Shuler informed him that the total amount, including costs, due under the decree was fifty-three hundred ($5,300.00) dollars, and that he instructed N. N. Newell to bid in the larger tract for him at that figure, thus clearing the title to the smaller tract, which could be bid in at a nominal figure, and he thus be allowed to make a clear title to J. P. Newell, as he had contracted to do, and that N. N. Newell assented to the proposition. N. N. Newell denies that he ever made any such agreement and on the contrary asserts that he refused to do so, and informed Scott that he was representing his uncle, J. P. Newell, and would bid for him fifty-three hundred ($5,300.00) dollars on the larger tract, and that he actually bid in the two tracts for his uncle at these figures."

The referee says in his report:

"I find as a matter of fact that the version of the transaction as given by Scott is correct. Standing alone, the statement of Scott would not necessarily compel such a conclusion, but corroborated as it is by other facts and circumstances of the case, I can draw no other inference."

I do not see how he could have arrived at a different conclusion, from these facts. The Newells and Scott were advised by Mr. Shuler that their interests were identical, and that they should agree upon a program of bidding; he left them in his front office in conference, which continued a few minutes; they separated, and in a short while N. N. Newell and Mr. Shuler had a brief conversation, in which N. N. Newell outlined the plan which evidently had been agreed upon, and which was carried out to the letter, Scott though having come for the purpose of running the first tract up to $5,300, leaving the bidding to him who, it had evidently been agreed upon, should conduct it. At the sale,

as stated, N. N. Newell made but a single bid upon each of
the tracts, $5,300 for tract No. 1, and $500 for tract No. 2;
both tracts were knocked down to him and charged to him
"as attorney."

Upon the issue, for whom was N. N. Newell acting, it
is a pertinent inquiry, that if J. P. Newell had had $5,800
in his pocket at the time, what possible motive could have
induced him to pay $5,300 for tract No. 1 and $500 for
tract No. 2? If he had paid $5,300 for tract No. 1, the Land
Bank mortgage debt would have been practically satisfied
(excepting a balance of about $225) and tract No. 2 hav-
ing been relieved of that incumbrance, Scott would have
been in a position to make him titles to that tract, upon his
paying to him $2,500; his bidding would, therefore, have
been greatly to the interest of Scott and not particularly in
his own interest; for if he had bid tract No. 1 off at $2,500
less than $5,300, he could have paid the $2,500 which he
owed to Scott on the Land Bank's mortgage, and saved
the difference between $5,300 and the amount of his bid
on his purchase of tract No. 1.

As a matter of fact, is there a particle of evidence that
J. P. Newell authorized N. N. Newell to bid the two tracts
off at the figures named, or at any other figures, or at all?
J. P. Newell did not take the stand and we have nothing
from him as to such authorization. N. N. Newell did take
the stand; he testified that through the foreclosure proceed-
ings instituted by the Land Bank, he represented his uncle,
J. P. Newell, and J. L. Newell, his son, and the record
shows that his efforts were not to protect what he consid-
ered an equity of one or the other, of $500 in tract No.
2, resulting from the cash payment of that amount to
Scott at the time the bond for titles were executed. The
nearest he came to testimony of such authorization was
that he had told Lawrimore that he could transfer his bid
to him as "I knew it would be agreeable to Uncle Joe (J.
P. Newell), as he had left the whole matter entirely in my

hands." The only "matter" which he shows was left in his hands by "Uncle Joe" was the protection of his supposed equity of $500 and the right to have tract No. 1 sold first. J. P. Newell was present at the sale, and present for the purpose of helping Scott out to the extent of a $500 payment upon his $2,500 obligation; yet there is not a word from him or from J. L. Newell, or from N. N. Newell, suggesting even that J. P. Newell intended to bid or to authorize N. N. Newell to bid upon either tract. At the solicitation of Scott, J. P. Newell had tried to raise as much as he could, and had succeeded to the extent only of $500. To imagine that J. P. Newell with only that amount in his pocket, and no possible chance to raise any more, expected to purchase, at a cash sale, property which in all probability, practically a certainty, would bring nearly $6,000, is incredible to a degree. With the exception of turning over the $500 which he had, to be credited on his $2,500 obligation to Scott, and which was paid by N. N. Newell to the Clerk of Court in compliance with the terms of sale, J. P. Newell faded from the case. According to the testimony of N. N. Newell, J. P. Newell had become the purchaser of both tracts, as he, N. N. Newell, was acting as his attorney in bidding off the property; yet there is not a suggestion of an effort on J. P. Newell's part to comply with the obligation to pay the remainder of the purchase price, or to exercise any right connected with the bidding off by N. N. Newell. If N. N. Newell was acting as attorney for J. P. Newell in the bidding, J. P. Newell acquired the right to control the bid. We find, however, that N. N. Newell was assuming to act with reference to the bid as if *he* was the beneficiary and not J. P. Newell. One would expect under these circumstances, if any transfers of bids were to be made, the principal and not the agent would complete the transaction. That the $500 was paid by J. P. Newell to assist Scott to comply with the bid, and to be credited upon the $2,500 debt, I have not the slightest

doubt, which makes it clear that the bid of N. N. Newell was the bid of Scott.

This is further demonstrated by the fact that immediately after the sale N. N. Newell gave to Scott a pencil memorandum of the amount that Scott was to raise, $5,300, which was the sale price of both tracts, $5,800 less $500 paid by the check of J. P. Newell, for which a receipt was to be returned by Scott to J. P. Newell.

I think that Mr. Shuler has very correctly sized up the situation in his testimony:

"I would like to explain just what I meant by writing the letter of September 22d. I am afraid that that is the letter that has caused the confusion here. I offered in that letter to be of any service I could, having in mind this, that Mr. Scott, already owner of the 30 acres of land, would probably give us a figure up to which to bid in the event that he couldn't come in person, or that Mr. Johnson could not come. I had in mind helping Mr. Scott in any way that I could, and being of any service that I could to Mr. Johnson, in bidding in any of the tracts, after our client was protected. I did it in order to render any service that I could. * * * Our prime purpose was to get enough money to take care of the Land Bank, and after that we didn't mind bidding to any other figure or amount requested by anybody."

Yet when Scott asked him to bid upon the land for him, and it was understood that it would be run up to $5,800, Mr. Shuler declined to do so and turned Scott over to N. N. Newell as the proper person, as their interests were identical, to bid for Scott. If Mr. Shuler had done what he practically offered to do, and now says he was willing to have done, the conflict between Scott and N. N. Newell would not now be pestering the Court. It is very clear to me that after what passed between Scott and Mr. Shuler, and Scott was referred to N. N. Newell, the latter agreed to do what Scott had asked Mr. Shuler to do.

The testimony of N. N. Newell and of Scott, as to whether N. N. Newell so agreed, is diametrically opposed. They are at stand-off. Scott's version is sustained by the natural inference to be drawn from the circumstances detailed; he is corroborated by Lawrimore, who testified that he heard N. N. Newell say that he had bid off the property for Scott; the circumstances occurring after the sale lend support to Scott's version; Scott testified that as soon as the sale was over, N. N. Newell approached him to discuss what had been done; he told Scott that he had to raise $500 and gave him a memorandum of the balance that had to be raised.

The sale was on October 6th; the transfer by N. N. Newell was on October 15th; the suit was commenced on October 16th; the answer of N. N. Newell was filed within 20 days, by November 5th. In that answer N. N. Newell alleges that in the bidding he was acting as attorney for *J. L. Newell,* the penniless man with a broken leg; in his testimony N. N. Newell swears not less than three times, that in the bidding he was acting as attorney for *J. P. Newell,* "Uncle Joe." The date of the reference does not appear in the transcript. It is passing strange that he did not know within three weeks after the sale, when his answer was filed, for whom he was acting.

The witness, Lawrimore, testified that after the sale he went to see J. P. Newell and that J. P. Newell said: "I don't know whether he (N. N. Newell) can sell that place or not. *Him and Mr. Scott are mixed up on that place.* I don't know whether he can sell the place or not." That he told N. N. Newell "if that is Mr. Scott's bid, I don't believe you can sell." N. N. Newell did not then, as naturally he would have done, deny that it was Scott's bid, but: "He says that the bid was in his name, and I can go to Kingstree and have the bid transferred to you and the Clerk of Court will give you a title." Exactly the power he as agent for some one certainly, claimed to and did exercise on October 15th.

Scott's conduct at the sale is very significant of his understanding that N. N. Newell was bidding for him. Tract No. 1 was bid off first, at $5,300; tract No. 2 was then offered; N. N. Newell bid $500 on it. Assuming that N. N. Newell's statement is true, that he was bidding for J. P. Newell, can it be imagined that Scott, who had $2,500 in tract No. 2, after the incumbrance of the Land Bank mortgage had thus been practically removed, would have stood by and allowed J. P. Newell to take it practically for nothing, and lose his entire debt? If Scott had had any idea that N. N. Newell was not bidding for him, he could have run tract No. 2 to any amount, and all that he would have had to pay would have been the small balance of about $225 on the Land Bank debt and costs.

Again, if N. N. Newell had been explicitly authorized by J. P. Newell to bid upon both tracts (of which I do not think there is even a suggestion in the evidence), N. N. Newell was the agent of J. P. Newell and all that he ascertained during the course of that agency is chargeable to J. P. Newell. From the whole situation, the anxiety of both Scott and the Newells to make tract No. 1 bring enough to satisfy the Land Bank's mortgage debt, the request of Scott to Mr. Shuler to bid the property in for him, the declination of Mr. Shuler and his reference of Scott to N. N. Newell as the proper one to do the bidding as the interests of Scott and the Newells were identical, the conference in the office of Lee & Shuler, the knowledge of N. N. Newell that Scott had come ·to protect his interest in tract No. 2, and the utter improbability of J. P. Newell having the remotest idea of bidding upon the property, all indicate a tacit if not·express understanding of co-operation, and convinces me that if N. N. Newell did not assent to Scott's request to bid for him, he is obligated to have known that that was Scott's understanding, and that it was his duty to remove that misunderstanding, if such existed. *Suppressio veri* is as culpable as *expressio falsi,* and is equally effective in working an estoppel.

In 39 Cyc., 180, it is said:

"Where one having an interest in land, confiding in the verbal promise of another (or, I interpolate, being led by the conduct of such other to believe) that he will purchase it at a judicial sale for the benefit of the former, takes no steps to protect his interest, but allows the promisee to acquire the land at such sale, a subsequent denial of the promise and refusal to carry it into execution is such a fraud as will convert the purchaser into a trustee *ex maleficio.*"

I fully indorse the sentiments expressed by Chancellor Mathews in the case of *Denton v. McKenzie,* 1 Desaus., 289; 1 Am. Dec., 664:

"From a full view and deep consideration of the whole case, we are of opinion that the attempt now made by the defendant to reserve to himself the absolute property in the land in question, deserves no other epithet than that of a gross fraud and imposition on a too credulous man"; and that it is "such a degree of hardiness, and such an attempt to pervert the true scope and beneficial effects of that law, as must ever receive the frowns of this Court."

I can see no difference between an express oral promise to bid for another and inducing another to refrain from bidding by silence with knowledge of his misapprehension. The first proposition is sustained by many of our cases: *Denton v. McKenzie,* 1 Desaus., 289; 1 Am. Dec., 664. *Keith v. Purvis,* 4 Desaus., 114. *McDonald v. May,* 1 Rich. Eq., 91. *Schmidt v. Gatewood,* 2 Rich. Eq., 162. *Kinard v. Heiers,* 3 Rich. Eq., 423; 55 Am. Dec., 643. *Cox v. Cox,* 5 Rich. Eq., 365. *Johnson v. La Motte,* 6 Rich. Eq., 347. *Lamar v. Wright,* 31 S. C., 60; 9 S. E., 736. *Jarrot v. Kuker,* 78 S. C., 510; 59 S. E., 533.

Even if Scott had not been under the apprehension that N. N. Newell had assented to his request that he bid upon the property for him, and that N. N. Newell bid as attorney for J. P. Newell (which I do not believe), the

424           SCOTT *v.* NEWELL, *et al.*

circumstances, the mutual, co-operating purpose of the parties to clear tract No. 2 of the Land Bank mortgage, the refraining of Scott from bidding, necessarily known to N. N. Newell, present an opening for the Court of Equity to declare J. P. Newell a trustee.

"The general principle is well established that equity prohibits a purchase by parties placed in a situation of trust *or confidence* with respect to the subject of the purchase; that no party can be permitted to purchase, for his own benefit, an interest, where he has a duty to perform which is inconsistent with the character of purchaser. *Dickinson v. Codwise,* 1 Sandf. Ch. (N. Y.), 226." *Brittin v. Handy,* 20 Ark., 381; 73 Am. Dec., 497.

But what to my mind is absolutely conclusive of the whole case is the position of the Special Referee, a most accomplished lawyer, ably presented, that conceding that N. N. Newell acted for J. P. Newell in bidding off the land, at the time of the sale J. P. Newell was a vendee in possession under a contract which bound his vendor, Scott, to clear the title of the Land Bank mortgage, and bound him to pay to Scott $2,500 when this should be done. As such vendee he had actual notice of the encumbrance on the property under which it was being sold, for it was mentioned in the contract. This contract between Scott and J. P. Newell established a fiduciary relation between them, which rendered it impossible for either to commit an act detrimental to the rights of the other. "This being true, if J. P. Newell bid in the property at the sale, he did not thereby acquire any independent title to the thirty-acre tract that he could assert against his vendor, and thus dispense with his duty to pay to his vendor the balance he owed him; but all that equity and good conscience permitted him to do was to charge to his vendor the amount paid by him for the outstanding title and have it credited on the balance due on the purchase price. * * * In all cases involving confidential relations, there exists the mu-

tual obligations of each of the parties to obtain no advantage at the expense of the other. To permit a vendee in possession to buy in an outstanding encumbrance, whether at a judicial sale or otherwise, and use it to defeat his duty to pay the vendor for the land, would violate this principle, and will not be countenanced by a Court of Equity."

In *Lawrence v. Kennedy,* 90 W. Va., 209; 111 S. E., 142, the Court said:

"It is very well established that a purchaser of real estate, or an interest in real estate, who is put in possession thereof by his vendor, cannot acquire an adverse interest so long as he holds the same, and if he does acquire such interest it will inure to the benefit of his vendor, if he desires to have the advantage thereof, upon payment of the purchase price thereof."

"Purchaser in possession under sales contract cannot assert title acquired by him adverse to vendor while he remains in possession under the contract." *Slocum v. Peterson,* 131 Wash., 61; 229 P., 20; 40 A. L. R., 1071.

"Thus   *   *   *   where a contract is made for the sale of land, the vendor is in equity immediately deemed a trustee for the vendee of the real estate, and the vendee is deemed a trustee for the vendor of the purchase money." 3 Story, Eq., 251.

In 27 R. C. L., 547, it is stated:

"If a purchaser who has been let into possession by his vendor, buys in a paramount outstanding title, he cannot set it up against the vendor, unless he first makes a *bona fide* surrender of the possession. It is also held, as a general rule, that the vendor has the right to demand that a paramount title to purchaser, shall enure to his benefit, on his paying the amount expended by the purchaser in making the purchase; and this is held true where one enters into possession under a contract giving him the option to purchase."

In Bigelow on Estoppel (2d Ed.), 259, is is said:

"It is a well established rule of equity that if a vendee buys in a better title than that of his vendor, the latter being guilty of no fraud, he (the vendor) can be compelled to refund to the vendee only the sum paid for the better title."

And at page 382, it is said:

"The relation which the purchaser of land not fully paid for bears to the vendor, is held to be the same in equity as that between landlord and tenant, so far as the doctrine of estoppel is concerned. The purchaser cannot set up an outstanding title against the vendor in bar of a proceeding by the latter to compel payment of the purchase money."

Commenting on the case of *Bush v. Marshall,* 6 How., 284; 12 L. Ed., 440, the author says:

"The doctrine of this case is that until the grantee is paid for the land, he holds, in respect to the payment, a relation of duty to the grantee similar to that of a tenant to his landlord * * * the grantee could not by this means, escape wholly the payment of the price agreed upon."

In *Smith v. Boyer,* 72 W. Va., 632; 78 S. E., 787; 46 L. R. A. (N. S.), 209, quoting syllabus by the Court, it is held:

"A vendee in possession cannot thereafter acquire a tax title to the land and claim thereunder adversely to his vendor." Citing *Callihan v. Russell,* 66 W. Va., 524; 66 S. E., 695; 26 L. R. A. (N. S.), 1176. *Lamborn v. Commissioners,* 97 U. S., 181; 24 L. Ed., 926. *Bush v. Marshall,* 6 How., 284; 12 L. Ed., 440. Bigelow on Estoppel, (5th Ed.), 545.

In *Galloway v. Finley,* 12 Pet., 295; 9 L. Ed., 1079, the Court said:

"In reforming the contract, equity treats the purchaser as a trustee for the vendor, because he holds under the latter, and acts done to perfect the title by the former, when in possession of the land, inure to the benefit of him

under whom the possession was obtained, and through whom the knowledge that a defect in the title existed was derived. The vendor and vendee stand in the relation of landlord and tenant; the vendee cannot disavow the vendor's title." *Willison v. Watkins,* 3 Pet., 48; 7 L. Ed., 596. *Conn's Heirs v. Manifee,* 2 A. K. Marsh. (Ky.), 242. *Wilson v. Smith,* 5 Yerg. (Tenn.), 398. *Watkins v. Holman,* 16 Pet., 25; 10 L. Ed., 873.

In the last-mentioned case it is said:

"In the present case the vendee has bought in for $20.00 a legal title to a property worth more than $2,000.00, the possession of which he received from his vendor.    *    *    *    He has got a good title to the property, and he ought, in justice and equity, to pay for it the full consideration which he has covenanted to pay."

In the case of *Roller v. Effinger,* 88 Va., 641; 14 S. E., 337, from which the foregoing quotations have been extracted, the Court, continuing, said:

"In this case Roller paid no more than he agreed to pay. In getting in the outstanding interests he used his vendor's money to make the payment, and yet claims that he was standing at arm's length, a position he did not assert until he had secured the complete title. A vendee of lands, entering before the conveyance is perfected, is affected with an equity in favor of his vendor; and, if he purchases an adverse title, he cannot set it up against his vendor, but the vendor is entitled to have it upon reimbursing the purchaser." Citing *Morgan's Heirs v. Boone's Heirs,* 4 T. B. Mon. (Ky.), 291; 16 Am. Dec., 153. *Harper v. Reno,* Freem. Ch. (Mich.), 323. *Wood v. Perry,* 1 Barb. (N. Y.), 115. *Keech v. Sanford,* 2 Eq. Cas., Abr., 741.

In *Mizamore v. Berglin,* 197 Ala., 111; 72 So., 347, L. R. A., 1916-F, 1024, it is held, quoting syllabus:

"A vendee in possession under an option contract holds an outstanding title acquired by him in trust for his vendor, and is estopped to set it up against the vendor."

In the opinion it is stated:

"The relationship of vendor and vendee has, so far as the question here involved is concerned, been likened unto that of landlord and tenant."

Citing many authorities, and continuing:

"The following quotation finds frequent reference in our cases: 'Wherever one person is placed in such relation to another, by the act of consent of that other, or the act of a third person, or of the law, that he becomes interested for him, or interested with him, in any subject of property or business, he is prohibited from acquiring rights in that subject antagonistic to the person with whose interests he has become associated.' " Citing many cases.

In the case of *Petroski v. Minzgohr,* 144 Mich., 356; 108 N. W., 77; 115 Am. St. Rep., 451, it is said:

"The vendor and vendee [of lands] stand in the relation of landlord and tenant; the vendee cannot disavow the vendor's title."

In *Kirkpatrick v. Miller,* 50 Miss., 521, the Court said:

"After doing homage to his vendor's title by purchase and entry under it, the vendee will not be tolerated to repudiate his allegiance to it, and transfer it to another title acquired whilst thus in possession. If such after-acquired title should be paramount, the vendee shall be esteemed as holding it in trust for his vendor, as having provided it to support and maintain his possession and his right under his original vendor. Whilst a Court of Equity holds the vendee to entire good faith to his vendor, and will not allow him to get in an outstanding title or incumbrance, and set it up in opposition to his vendor, yet it will lend its aid to reimburse all reasonable advances expended to fortify the title. At the same time it will rebuke every attempt by the purchaser to betray or invalidate the title."

It seems to me impossible to present the principles of law in a clearer manner.

In the case of *Frink v. Thomas,* 20 Or., 265; 25 P., 717; 12 L. R. A., 239, the Court said:

"But defendant having entered into the possession of this land under a contract of purchase, will not be permitted to obtain an outstanding title and assert it against the plaintiff. It was expressly understood at the time the contract for sale of this land was made that the title was unsettled, and that plaintiff would take such steps as might be necessary, in order to perfect the same, so as to comply with his agreement with defendant. With this understanding, defendant was allowed to go into possession of the land, and having done so, neither equity nor good conscience will permit him, by taking advantage of such possession, to obtain the title from the general government in his own name for his own use and benefit."

It seems that this statement was made to fit the very circumstances of the case at bar. The Court continuing said:

"It is an established rule of equity 'that if a vendee buys up a better title than that of the vendor, and the vendor was guilty of no fraud, he can only be compelled to refund to the vendee the amount of money paid for the better title. Equity treats the purchaser as a trustee for his vendor, because he holds under him, and acts done to perfect the title of the former when in possession of the land inure to the benefit of him under whom the possession was obtained, and through whom a knowledge of a defect of title was obtained. The vendor and vendee stand in the relation of landlord and tenant. The vendee cannot disavow the vendor's title.' "

In *Lake v. Hancock,* 38 Fla., 53; 20 So., 811; 56 Am. St. Rep., 159, the Court said:

"A party having the right to enter into possession of land, and agreeing to so enter in a contract of purchase based upon an acknowledgment of title in another, and obtaining possession so far as this party is concerned under such

agreement, is estopped from referring his possession to rights acquired under a conveyance by a third party to him. A party thus entitled to possession, or thus in possession, acquiring an outstanding title, holds it in trust, and not for his own benefit."

In *Morgan v. Boone,* 4 T. B. Mon. (Ky.), 73; 16 Am. Dec., 153, the Court said:

"It is a general principle that if a trustee, mortgagee, tenant for life or purchaser, gets an advantage by being in possession, or behind the back of the party interested, and purchases in an outstanding title or incumbrance, he shall not use it for his own benefit, and the annoyance of him under whose title he entered, but shall be considered as holding it in trust. It is sufficient for this doctrine to refer to the case of *Holridge v. Gillespie,* 2 Johns. Ch., 33, 34, in which Chancellor Kent has given references to many cases, old and new."

In *Champlin v. Dotson,* 13 Smedes & M. (Miss.), 553; 53 Am. Dec., 102, the Court said:

"It is a principle of equity jurisprudence, then, that a vendee cannot buy the land under an outstanding incumbrance, and set up an adverse title; he can only claim to be refunded the amount paid by him. If he should claim more than this, a Court of equity would interpose to prevent a recovery."

In *Meadows v. Hopkins,* Meigs (Tenn.), 181; 33 Am. Dec., 140, the Court said referring to relation of vendor and vendee:

"This relation is somewhat similar to that which exists between a landlord and his tenant. Having recognized the title in the one instance by the acceptance of a lease, and in the other by a purchase, you shall do nothing to the prejudice thereof, so long as the relation continues."

In *Greeno v. Munson,* 9 Vt., 37; 31 Am. Dec., 605, it is held, quoting syllabus:

"One who goes into possession under another, or acknowledging the title of another, cannot be heard to dispute the title of that other, during the continuance of the relation. This principle extends to one who acquires possession under a contract of sale."

In *Thredgill v. Pintard,* 12 How. (53 U. S.), 24; 13 L. Ed., 877, it is held:

"A purchaser of land cannot avail himself of the benefit of the contract for its sale and resist performance of it on this part, and an attempt to avoid payment of the price by procuring the title in his own name is fraudulent."

In *Munford v. Pearce,* 70 Ala., 452, it was held:

"A purchaser of land who, after taking possession under his contract for the purpose of perfecting his title, buys the land for a nominal price at an administrator's sale, by agreement with all parties, cannot set up the title thus acquired against his vendor."

In *Hill v. Samuel,* 31 Miss., 307, the Court held:

"Where the vendee, in a contract for the sale of lands, bought in an outstanding incumbrance, he could not set up such paramount title for the purpose of avoiding his contract, nor as a defense against the vendor's claim for purchase money, except to the extent of the sum actually paid by him in extinguishing the incumbrance."

In *Thompson v. Adams,* 55 Pa., 479, the Court held:

"A vendee purchasing a vendor's title at a Sheriff's sale, cannot withhold the unpaid purchase money, except so much as he has expended in buying in the title."

In *Ins. Co. v. Bulte,* 45 Mich., 113; 7 N. W., 707, the Court held:

"A purchaser in possession under an executory contract cannot cut off his vendor's rights by taking a tax title."

In *Curran v. Banks,* 123 Mich., 594; 82 N. W., 247, the Court held:

"Where a defendant, in possession of land under a contract of purchase made in 1895, purchased a tax title to the

land based on taxes of 1893, such title inured to the benefit of the grantor, since the doctrine that a tenant cannot dispute his landlord's title extends to one in possession under a contract of purchase."

In, *Simons v. Rood,* 129 Mich., 345; 88 N. W., 879, the Court held:

"One who purchases land, agreeing to pay an existing mortgage, and a certain amount to the vendor, who retains the title till payment is made, occupies the position of mortgagor to the vendor and existing mortgagee, and cannot, as against them, acquire a tax title under a sale for an existing tax."

In *Crumb v. Wright,* 97 Mo., 13; 10 S. W., 74, the Court held:

"The rule that until the grantee had paid the purchase money he holds, in respect to the payment, a relation of duty to the grantor similar to that of a tenant to his landlord, and is precluded to that extent, and by a similar estoppel, from invoking to his aid an outstanding title, prevails both at law and in equity."

In *Burke v. Scharf,* 19 N. D., 227; 124 N. W., 79, the Court held:

"While a vendee remains in possession under a contract of sale, he is estopped to buy an outstanding title and assert same against his vendor."

In *Finch v. Noble,* 49 Wash., 578; 96 P., 3; 126 Am. St. Rep., 880, the Court held:

"A purchaser in possession under a contract of sale is estopped to deny the title of his vendor, and will not be permitted to acquire a title adverse to him."

In *McCreary v. McGregor,* 183 Iowa, 732; 167 N. W., 633, the Court held:

"Purchaser of land in possession under contract by redeeming from mortgage foreclosure, though obtaining Sheriff's deed, cannot assert legal title against vendor's lien."

In *Herron v. Harbour,* 75 Okl., 127; 182 P., 243; 29 A. L. R., 905, the Court held:

"Where a purchaser acquires an adverse title which inures to the benefit of his vendor, the most that the purchaser can demand is to be reimbursed for his outlay; including his payment in acquiring outstanding and superior title and in perfecting vendor's title, with interest and expenses necessarily incurred, not to exceed value of land."

In *Bank v. Rogers,* 87 Fla., 147; 99 So., 546, the Court held:

"The purchase at an execution sale against his vendor by a vendee while he remains in possession of the land which he is under an executory contract to purchase, entitles him to defend only to the extent of the amount paid by him."

In the South Carolina case of *Bradley v. Calhoun,* 125 S. C., 70; 117 S. E., 811, the Court said:

"The principle is just and well established that, where one's possession was begun in privity with or in subservience to the title of another, a *quasi fiduciary* relation is established, and before a foundation can be laid for the operations of the Statute of Limitations or the defense of adverse possession by the acquisition of an outstanding title, a clear, positive, and continued disclaimer of the title under which he entered and the assertion of an adverse claim must be brought home to the other party."

In the case of *Smith v. Smith,* Harp. Eq., 160, it was held that a lease from a party whose title was claimed to have been superior to that of the landlord which the lessee procured, inured to the use of the landlord. See, also, *Maples v. Spencer,* 97 S. C., 331; 81 S. E., 483.

The following cases bear somewhat indirectly upon the question: *Garvin v. Cohen,* 13 Rich., 153. *Pyles v. Reeve,* 4 Rich., 555. *Van Lew v. Parr,* 2 Rich. Eq., 321.

The actual result of sustaining the conduct of N. N. Newell in this case is the best argument that could be made in support of the proposition that J. P. Newell could not, so

long as he was in possession under a contract of sale from Scott, acquire a title adverse to that under which he went into possession. J. P. Newell, or his pretended assignees, would acquire title to tract No. 2, worth $3,000, for $500; J. P. Newell's obligation to Scott would be annulled, and Scott would be in the vocative to the extent of $2,500; a result which I do not think a Court of equity would countenance for a moment.

It does not appear that the title of Mrs. Simmons to tract No. 1 is involved in this litigation, she not having been made a party thereto.

I think that the judgment of the Circuit Court should be affirmed and that the case should be remanded to that Court for such further and amendatory administrative order as has been made necessary by the delay incident to this appeal.

Mr. Justice Carter (dissenting): Being unable to agree to the conclusion reached in the leading opinion of the Court in this case, I shall briefly state my reasons for dissenting therefrom.

As pointed out by the Special Referee, in his full and very able report, the case does not turn on the decision of the controverted issues of fact. Granting that the defendants had no intention of doing Scott, the plaintiff, a wrongful act; and, further, granting that the defendant, N. N. Newell, did not promise Scott to bid for him at the sale of the land in question, it does not follow that the judgment should be reversed. The ultimate decision depends upon the principles involved by reason of the admitted relation of the parties. Scott had obligated to sell to J. P. Newell and he had obligated to purchase from Scott the land in question, the 30-acre tract, for the sum of $3,000, paying to Scott the sum of $500 cash, and agreed to pay the balance, $2,500, after the said parcel of land was cleared of the Federal Land Bank mortgage, and to pay 8% interest per annum, payable annually, beginning January 1, 1924, and papers were executed to that effect. At the time of the sale under

the land bank mortgage J. P. Newell was the vendee in possession of this 30-acre tract, under the said contract of sale, and it was Scott's duty under said sale contract to clear the said tract of land of the Land Bank mortgage; and it was equally the duty of J. P. Newell to pay to Scott the said $2,500, when this Land Bank mortgage was gotten out of the way. J. P. Newell knew all about this mortgage and knew the purpose for which the land was being sold. There existed, therefore, as pointed out by the referee, a fiduciary relation between these parties, Scott and J. P. Newell, and for this reason neither of them could in good conscience take advantage of any condition that might arise to the injury of the other. Therefore, assuming that at the sale N. N. Newell bid for J. P. Newell, neither N. N. Newell, as attorney, nor J. P. Newell, the principal, had any right to transfer to a third party the bid without the consent of Scott.

Furthermore, the parties to whom the bid was assigned and the deed to the land in question executed, are the sons of J. P. Newell, and the record shows that the necessary money for putting over the transaction was raised at the instance and through J. P. Newell. One can hardly read the record in the case without coming to the conclusion that the deed so executed to the 30-acre tract of land in question was for the benefit of J. P. Newell.

As I view the case, while assuming that there was no wrongful intention on the part of any of the defendants, I think the order of Judge Wilson should be sustained. In support of the views herein expressed I call attention to the authorities cited in the report of the Special Referee, which report will be incorporated in the report of the case.

Therefore, I think the judgment of this Court should be, that the appellants' exceptions be overruled and the judgment of the Circuit Court affirmed.